452 F.3d 145
 William F. MATTHEWS, Estate of William F. Matthews Sr., Plaintiffs-Appellants,
v.
Michael O. LEAVITT, Secretary of the Department of Health and Human Services and Excellus, Inc., a Medicare Plus Choice Organization doing business as Senior Choice, Defendants-Appellees.
Docket No. 05-4853-cv.
 United States Court of Appeals, Second Circuit.
 Argued: May 11, 2006.
 Decided: June 20, 2006.
 
 William W. Berry, Legal Services for the Elderly, Disabled or Disadvantaged of Western New York, Inc., Buffalo, NY, for Plaintiffs-Appellants.
 Susan M. Bozinko, Assistant Regional Counsel, United States Department of Health and Human Services, Office of the General Counsel—Region II, New York, N.Y. (Kathleen M. Mehltretter, Acting United States Attorney, Jane B. Wolfe, Assistant United States Attorney, United States Attorney's Office for the Western District of New York, Buffalo, NY; Paula M. Stannard, Acting General Counsel, Joel Lerner, Chief Counsel—Region II, Rachel Park, Assistant Regional Counsel, United States Department of Health and Human Services, Office of the General Counsel— Region II, New York, NY, on the brief), for Defendant-Appellee Michael O. Leavitt.
 Cheryl Smith Fisher, Magavern, Magavern & Grimm, L.L.P., Buffalo, NY, for Defendant-Appellee Excellus, Inc.
 Before WINTER, CABRANES and RAGGI, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 We consider here whether an Administrative Law Judge ("ALJ") adjudicating a dispute over entitlement to benefits pursuant to the terms of an agreement between an enrollee and a Medicare + Choice provider under Medicare Part C[1] has statutory authority to hear a state law contract claim for damages independent of the ALJ's determination of the enrollee's entitlement to benefits pursuant to the agreement. We hold that an ALJ lacks statutory authority to entertain such a claim, and that the ALJ here properly declined to hear Matthews's claim for breach of contract damages. Accordingly, we affirm the judgment of the United States District Court for the Western District of New York (John T. Curtin, Judge) awarding the Secretary of Health and Human Services (the "Secretary") judgment on the pleadings pursuant to Federal Rule of Civil Procedure 56(c) and dismissing plaintiffs' claims.
 
 
 2
 We recount only those facts of the case that are necessary for resolution of this appeal.
 
 
 3
 William F. Matthews, Sr., now deceased, was a Medicare beneficiary enrolled in a Medicare + Choice plan called Senior Choice, which was administered by Excellus Health Plan, Inc.[2] During the period between October 1, 1997 and March 23, 1998, Matthews was hospitalized on three separate occasions, each of which was followed by a stay at a skilled nursing facility ("SNF"). See 42 C.F.R. § 409.31 (defining skilled nursing and skilled rehabilitation services). The first instance of hospitalization occurred on September 25, 1997, when Matthews, who was suffering from septic arthritis with osteomyelitis, was admitted to Buffalo General Hospital. He was discharged on October 1, 1997, after having had a toe removed, and transferred to the Hamburg Health Care SNF, where he received treatment until October 13, 1997. The second instance of hospitalization occurred on October 31, 1997, when Matthews was again admitted to Buffalo General Hospital, this time with dehydration and gastroenteritis. On November 13, 1997, he was discharged and transferred to Garden Gate Manor SNF.
 
 
 4
 On December 9, 1997, while at Garden Gate Manor SNF, Matthews was informed by Senior Choice that it had made an "organization determination"[3] that as of December 16, 1997, his stay at Garden Gate Manor SNF would no longer be covered because he would soon meet his rehabilitation goals. Under the applicable regulations, such an organization determination regarding entitlement to benefits was binding unless reconsideration was sought. See 42 C.F.R. § 417.612 (1998) (repealed) (organization determinations binding unless reconsideration sought); 42 C.F.R. § 422.576 (2006) (currently applicable analogous provision); see also 42 C.F.R. § 417.614 (1998) (repealed) (providing right to seek reconsideration of organization determinations); 42 C.F.R. § 422.578 (2006) (currently applicable analogous provision).[4]
 
 
 5
 On December 12, 1997, Matthews's son sought expedited reconsideration, see 42 C.F.R. § 417.617(c)(2) (1998) (repealed) (providing for expedited reconsideration); 42 C.F.R. § 422.566(a) (2006) (currently applicable analogous provision), with respect to Matthews's entitlement to SNF services, and Senior Choice denied the request. Matthews's request for reconsideration was instead processed in the ordinary course, and on January 26, 1998, Senior Choice affirmed its decision to deny coverage.
 
 
 6
 The regulation that governed reconsideration of organization determinations also provided for mandatory review by the Health Care Financing Administration ("HCFA"), see note 3 ante, of an adverse organization determination that had been upheld on reconsideration. See 42 C.F.R. § 417.620(b) (1998) (repealed); see also 42 C.F.R. § 422.592(a) (2006) (currently applicable provision that mandates review by "an independent, outside entity that contracts with [Centers for Medicare and Medicaid Services[5]]"). After Senior Choice denied Matthews's claim on reconsideration, his file was forwarded to the Center for Health Dispute Resolution ("CHDR"), an independent, third-party entity under contract with the HCFA to provide automatic review on behalf of the HCFA. By letter dated April 9, 1998, the CHDR notified Matthews that it had reviewed his case file and that it had upheld the decision of Senior Choice to terminate Matthews's coverage for his stay at Garden Gate Manor SNF.
 
 
 7
 After an enrollee's case was reviewed by the HCFA or its designee, he was entitled to a hearing before an ALJ if he remained aggrieved and there was a sufficient amount in controversy. See 42 C.F.R. § 417.630 (1998) (repealed); 42 C.F.R. § 422.600(a) (2006) (currently applicable analogous provision). On June 10, 1998, Matthews wrote to CHDR requesting a hearing before an ALJ. There is no indication in the record that a hearing before an ALJ was ever held in the wake of Matthews's request or that any further action was taken by the parties with respect to that request.
 
 
 8
 Matthews's third hospitalization occurred when he fell at his home, the day after being discharged from Garden Gate Manor SNF. He was taken to the Lakeshore Hospital emergency room for evaluation and then transferred to Buffalo General Hospital to be treated for a fractured wrist. On December 19, 1997, Matthews was released and transferred to a third SNF—Gardens at Manhattan—where he received physical and occupational therapy. On February 11, 1998, Senior Choice sent Matthews a letter, informing him that pursuant to the terms of the Senior Choice Subscriber Agreement (the "Subscriber Agreement"), which capped his SNF coverage at 100 days per "spell of illness,"[6] he would exhaust that coverage as of February 13, 1998. Matthews was not discharged until March 23, 1998, by which time he had spent 38 days in the SNF following the exhaustion of his coverage.
 
 
 9
 Matthews requested reconsideration of Senior Choice's determination that his SNF coverage was exhausted. He conceded that he had spent the covered 100 days in SNFs during one spell of illness, but claimed that he was entitled to additional coverage because "Senior Choice . . . forced Mr. Matthews to return home [from his earlier stay at the Garden Gate Manor SNF] before he was physically ready" on December 15, 1997, which had, according to Matthews, caused him to fall at his home and to require the third period of hospitalization and SNF care. Letter of Damon M. Gruber to Rebecca Ritchie, March 17, 1998, at 2.
 
 
 10
 Senior Choice upheld its denial of coverage on April 21, 1998. CHDR reviewed Senior Choice's decision and affirmed the denial of coverage on June 15, 1998. On July 1, 1998, Matthews sought a hearing before an ALJ, claiming that a "premature discharge from Garden Gate Nursing Home . . . directly resulted in a fall and fractured wrist, requiring readmission to a hospital on December 16, and nursing home on December 19, prolonging Mr. Matthews's recuperation and forcing him to exhaust his 100 day limitation of coverage, which, but for the financially-motivated discharge, would not have happened." Letter of William W. Berry to the CHDR, July 1, 1998, at 1.
 
 
 11
 ALJ Verner Love of the Social Security Administration Office of Hearings and Appeals[7] held a hearing on November 23, 1999. The ALJ repeatedly noted that Matthews seemed to be asserting a medical malpractice claim and that a hearing before an ALJ was not an appropriate forum in which to advance such a claim. Matthews's counsel agreed that he could not pursue a malpractice claim before the ALJ, but argued that even though Senior Choice had satisfied the plain terms of its Subscriber Agreement by providing the full 100 days of SNF coverage required, that Senior Choice nevertheless breached its Subscriber Agreement because it improperly cut off Matthews's coverage when he had been at the Garden Gate Manor SNF, thereby causing him to be prematurely released, to fall, to be reinjured and to require additional SNF care.
 
 
 12
 On April 20, 2000, the ALJ issued a decision in which he considered and rejected Matthew's argument that Senior Choice should be held responsible for the cost of the additional 38 days that Matthews had spent at Gardens at Manhattan SNF because Senior Choice had allegedly provoked Matthews's prior, premature discharge from the Garden Gate Manor SNF. The ALJ concluded that Senior Choice had satisfied its obligations to Matthews under the requirements of the Medicare + Choice Program and the Subscriber Agreement. The ALJ also noted that
 
 
 13
 [n]either the further issue of careless negligence or unauthorized action on the part of Senior Choice in discharging the beneficiary from the Garden Gate Manor on December 15, 1997, nor the issue of the forseeability of the alleged consequences thereof, is within the jurisdiction of this forum. These issues, in the nature of medical malpractice and any alleged damages arising therefrom, are appropriate to the civil courts of general jurisdiction.
 
 
 14
 In re William Matthews, Decision, at 4 (Soc. Sec. Admin. Office of Hearings and Appeals Apr. 20, 2000).
 
 
 15
 On June 19, 2000, Matthews sought appellate review by the Medicare Appeals Council of the Department of Health and Human Services, see 42 C.F.R. § 422.608 (2000) ("Any party to [a] hearing, including the [Medicare + Choice] organization, who is dissatisfied with the ALJ hearing decision, may request that the [Medicare Appeals Council] review the ALJ's decision or dismissal."), which denied the request for review in a letter dated February 12, 2003.
 
 
 16
 Matthews then filed an action in the United States District Court for the Western District of New York pursuant to 42 U.S.C. § 405(g), contending that the ALJ erred in "declining to exercise jurisdiction over common law breach of contract issues," Compl. ¶ 13—namely, Matthews's theory that Senior Choice had breached the covenant of good faith and fair dealing implied in the Subscriber Agreement by allegedly causing Matthews's premature release from the Garden Gate Manor SNF, see, e.g., State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir.2004) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts." (internal quotation marks omitted))—and that the Secretary's decision was "not supported by substantial evidence," Compl. ¶ 14. Defendant Secretary moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 56(c), and the District Court granted that motion in a thoughtful and careful opinion dated April 18, 2005. The District Court found that although the ALJ never explicitly addressed Matthews's implied covenant of good faith and fair dealing contract law theory in his written decision, the ALJ made clear that he had considered all of the arguments that Matthews's counsel advanced, which included the argument that Senior Choice had denied Matthews benefits to which he was entitled under the Subscriber Agreement with respect to his stay at Gardens at Manhattan SNF by allegedly prematurely terminating coverage for his stay at the Garden Gate Manor SNF. The Court also rejected the contention that the ALJ erred in failing to exercise jurisdiction over plaintiffs' independent breach of contract claim for damages. In addition, the District Court determined that substantial evidence supported the ALJ's decision.[8]
 
 
 17
 On appeal, Matthews's son and Matthews's estate (collectively, the "Estate") do not argue that Senior Choice provided coverage for fewer than the 100 days of coverage required pursuant to the express terms of the Subscriber Agreement. Instead, contending that Senior Choice breached the implied covenant of good faith and fair dealing inherent in contracts under New York law, the Estate urges that the ALJ should have assumed jurisdiction over Matthews's independent breach of contract action for "virtually liquidated contract damages; namely, the cost of 38 days of additional skilled nursing care beyond the explicitly-covered 100 days, directly caused by the breach." Appellants' Br. at 24. Moreover, the Estate maintains that there was not substantial evidence to support the ALJ's determination.
 
 
 18
 We find that substantial evidence supported the ALJ's decision of April 20, 2000 because the record plainly reveals, as the ALJ found, that plaintiff exhausted his 100-day limit for SNF coverage during a single spell of illness. See 42 U.S.C. § 405(g) (obliging a district court to abide by any factual finding of the Secretary "if supported by substantial evidence").[9]
 
 
 19
 With respect to the Estate's claim that the District Court improperly concluded that the ALJ did not err in declining to exercise jurisdiction over Matthew's independent breach of contract claim for damages, we hold that an ALJ has no statutory authority to entertain a state common law breach of contract claim for damages, and we therefore affirm the judgment of the District Court.
 
 
 20
 The Estate maintains that 42 U.S.C. § 1395w-22(g)(5) authorized the ALJ to hear the state law contract claim for damages. According to that provision, "[a]n enrollee with a Medicare + Choice plan . . . who is dissatisfied by reason of the enrollee's failure to receive any health service to which the enrollee believes the enrollee is entitled and at no greater charge than the enrollee believes the enrollee is required to pay is entitled, if the amount in controversy is $100 or more, to a hearing before the Secretary to the same extent as is provided in section 405(b) of this title." Section 405(b)(1) of Title 42 empowers the Commissioner of Social Security to hold a hearing "to make findings of fact[] and decisions as to the rights of any individual applying for a payment under this subchapter." That provision also grants the Commissioner the authority to "administer oaths and affirmations, examine witnesses, and receive evidence," and provides that "[e]vidence may be received at any hearing before the Commissioner of Social Security even though inadmissable under the rules of evidence applicable to court procedure." 42 U.S.C. § 405(b)(1).
 
 
 21
 The authority of an ALJ is "circumscribed by the appointing agency's enabling statutes and its regulations." In re Marion Citrus Mental Health Ctr. v. Ctrs. for Medicare & Medicaid Servs., No. C-99-508, Decision at 4 (Dep't of Health and Human Servs. Departmental Appeals Bd. Jan. 29, 2002); see also Bodimetric Health Servs., Inc. v. Aetna Life & Cas., 903 F.2d 480, 487 (7th Cir.1990) ("A party cannot avoid the Medicare Act's jurisdictional bar simply by styling its attack as a claim for collateral damages instead of a challenge to the underlying denial of benefits."). The Estate points to no statement in the applicable statutory or regulatory scheme that empowers an ALJ to hear a state law breach of contract claim for damages.
 
 
 22
 The Estate contends that because 42 U.S.C. § 1395w-22(g)(5) provides that an ALJ may adjudicate an enrollee's claim of entitlement to "any health service," an ALJ can hear a breach of contract claim for damages. Although the statutory language to which the Estate refers presumably empowers an ALJ to determine, as the ALJ did here, whether a Medicare Part C enrollee is entitled to particular supplemental benefits under the terms of his agreement with his provider—an undertaking that may involve the application of state contract law principles—it does not provide for the adjudication by the ALJ of a state law breach of contract action for damages that is independent of the ALJ's determination of entitlement to benefits under the terms of the applicable agreement.
 
 
 23
 The statutory framework plainly does not contemplate the litigation of ordinary state law causes of action for damages before ALJs. For example, nothing in the statute provides that an ALJ may convene a jury. Under New York law, a party is entitled to have a jury trial in a civil action. See N.Y. Const. art. 1, § 2; Sharrow v. Dick Corp., 86 N.Y.2d 54, 59, 629 N.Y.S.2d 980, 653 N.E.2d 1150 (1995). In addition, 42 U.S.C. § 405(b)(1) expressly provides for the admission of evidence that would not be admissible in a court proceeding in "any hearing before the Commissioner" (emphasis added). It would be an anomalous result that a litigant could entirely sidestep the rules of evidence with respect to a breach of contract action for damages by asserting his claim before an ALJ, rather than bringing it in a court of competent jurisdiction.
 
 
 24
 For the foregoing reasons, we hold that an ALJ is not vested with authority to hear an ordinary breach of contract suit for damages independent of his determination of entitlement to benefits pursuant to the terms of a Medicare + Choice agreement under Medicare Part C.[10]
 
 
 25
 We have considered all the Estate's arguments on appeal and find each of them to be without merit. Accordingly, we AFFIRM the judgment of the District Court.
 
 
 
 Notes:
 
 
 [1]
 Medicare, the federal government's health insurance plan for the elderly and certain persons with disabilities, automatically provides coverage to qualifying individuals for inpatient treatment and related services under Medicare Part ASee K&A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health of the State of New York, 189 F.3d 273, 276 (2d Cir.1999); see also 42 U.S.C. §§ 1395c to 1395i-5 (statutory provisions governing Medicare Part A). Medicare Part B, which covers visits to doctors and certain other outpatient treatment, is "a voluntary program offering supplemental insurance coverage for those persons already enrolled in the Medicare `Part A' program." Furlong v. Shalala, 238 F.3d 227, 229 (2d Cir.2001); see also 42 U.S.C. §§ 1395j to 1395w-4 (statutory provisions governing Medicare Part B). Medicare Part D provides coverage for prescription medications to qualifying enrollees. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. 108-173, Title I, §§ 101-111, 117 Stat.2066, 2071-2176 (Dec. 8, 2003) ("Medicare Prescription Drug Act") (codified at 42 U.S.C. §§ 1395w-101 to 1395w-152).
 This appeal concerns benefits under Medicare Part C, which allows a managed care organization to enter into a "risk contract" to provide an enrollee a full range of Medicare services in exchange for monthly payments that the organization receives from the government. See Minnesota Senior Fed'n, Metro. Region v. United States, 273 F.3d 805, 807 (8th Cir.2001); see also 42 U.S.C. §§ 1395w-21 to 1395w-29 (statutory provisions governing Medicare Part C). Medicare + Choice was the revised form of Part C enacted as part of the Balanced Budget Act of 1997, Pub.L. No. 105-33, Title IV, §§ 4001-4006, 111 Stat. 251, 275-334 (Aug. 5, 1997). Medicare + Choice was intended to "allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare . . . [and to] enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H. Conf. Rep. No. 105-217, at 585 (1997), reprinted in 1997 U.S.C.C.A.N. 176, 205-06. The Medicare Prescription Drug Act has since replaced Medicare + Choice with the Medicare Advantage Program, see Medicare Prescription Drug Act Title 11, §§ 201-241, 117 Stat. at 2176-2221, but it is the Medicare + Choice Program that is relevant to this appeal.
 Generally, an enrollee is eligible to take part in Medicare Part C only if he is "entitled to benefits under [P]art A . . . and enrolled under [P]art B." 42 U.S.C. § 1395w-21(a)(3)(A). A participating organization, see 42 U.S.C. § 1395w-28(a)(1), must provide enrollees the benefits and services (other than hospice care) that are available to people living in the area served by the plan under Medicare Parts A and B, see 42 U.S.C. § 1395w-22(a)(1), and may also offer supplemental benefits approved by the Secretary of Health and Human Services, see 42 U.S.C. § 1395w-22(a)(3).
 
 
 [2]
 Matthews was actually enrolled in a program of Health Care Plan, Inc., which was a predecessor of Excellus Health Plan, Inc. doing business in western New York as Univera Health Care. For simplicity, all of these entities are referred to as Senior Choice
 
 
 [3]
 Medicare Part C organizations are required to maintain "a procedure for making [organization] determinations regarding whether an individual enrolled with the plan of the organization. . . is entitled to receive a health service. . . and the amount (if any) that the individual is required to pay with respect to such service." 42 U.S.C. § 1395w-22(g)(1)(A). An "organization determination" includes the "[d]iscontinuation of a service (such as a skilled nursing facility discharge), if the enrollee disagrees with the determination that the service is no longer necessary." 42 C.F.R. § 417.606(a)(4) (1998) (repealed); 42 C.F.R. § 422.566(b)(4) (2006) (currently applicable analogous provision)
 When the "organization determinations" at issue here were made (on December 9, 1997 and February 11, 1998), the Secretary had not yet promulgated the regulations of Part 422 of 42 C.F.R. that eventually governed Medicare + Choice. Rather, the then-existing regulations in Part 417 of 42 C.F.R., which applied to managed care organizations that contracted with the Health Care Financing Administration (the entity to which the Secretary delegated his authority to administer the Medicare laws, see note 5, post) were applied to Medicare + Choice. See Medicare Program; Establishment of the Medicare + Choice Program, 63 Fed.Reg. 34968, 34969 (June 26, 1998).
 On June 26, 1998, the Secretary promulgated the regulations of Part 422 of 42 C.F.R., which specifically provided for the administration of Medicare + Choice. See generally id. On January 28, 2005, after the Medicare Advantage Program replaced the Medicare + Choice Program, see note 1, ante, the regulations in Part 422 were amended to reflect the creation of the new program, and the provisions of 42 C.F.R. §§ 417.602 to 417.638 were repealed. See generally Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed.Reg. 4588 (Jan. 28, 2005).
 In contrast to the applicable regulations, none of the applicable statutory provisions has been appreciably altered. Accordingly, for simplicity, this opinion refers to the versions of those statutory provisions contained in the current United States Code.
 
 
 [4]
 According to the then-applicable regulation,
 [a] reconsidered determination is a new determination that—
 (a) [i]s based on a review of the organization determination, the evidence and findings upon which it was based, and any other evidence submitted by the parties or obtained by [the Medicare + Choice organization]; and
 (b) [i]s made by a person or persons who were not involved in making the organization determination.
 
 
 [42]
 C.F.R. § 417.622 (1998) (repealed); 42 C.F.R. § 422.580 (2006) (currently applicable analogous provision)
 
 
 [5]
 The Health Care Financing Administration has been known since 2001 as the Centers for Medicare and Medicaid ServicesSee Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163, 168 & n. 2 (2d Cir.2006).
 
 
 [6]
 According to the applicable statutory provision,
 [t]he term "spell of illness" with respect to any individual means a period of consecutive days—
 (1) beginning with the first day (not included in a previous spell of illness)
 (A) on which [the] individual is furnished inpatient hospital services, inpatient critical access hospital services or extended care services, and (B) which occurs in a month for which he is entitled to benefits under [P]art A . . . and
 (2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is [not] an inpatient of a . . . [skilled nursing facility]. . . .
 42 U.S.C. § 1395x(a). The parties agree that all of Matthews's relevant stays in SNFs occurred during one "spell of illness."
 Although the Subscriber Agreement did not offer any supplemental benefits, see 42 U.S.C. § 1395w-22(a)(3), with respect to the number of days of SNF coverage per spell of illness, see 42 U.S.C. § 1395d(a)(2)(A) (ordinary Medicare also covers 100 days), it did provide a supplemental benefit by covering those 100 days in full. Ordinary Medicare, by contrast, requires that a beneficiary begin paying a copayment on the twenty-first day of SNF care. See 42 C.F.R. § 409.61(b).
 
 
 [7]
 The Office of Medicare Hearings and Appeals of the Department of Health and Human Services has since assumed responsibility for ALJ hearings relating to Medicare benefitsSee Office of Medicare Hearings and Appeals; Statement of Organization, Functions, and Delegations of Authority, 70 Fed.Reg. 36386, 36386 (June 23, 2005).
 
 
 [8]
 Although the District Court also noted that Matthews seemed to have failed to exhaust his administrative remedies with respect to his discharge from Garden Gate Manor SNF because he never received a hearing before an ALJ on the issue notwithstanding his request for one, the Court did not rest its decision on that ground
 At oral argument, counsel for the Secretary was unable to provide any explanation for why Matthews's request for a hearing on the Garden Gate Manor SNF discharge issue went unheeded. In light of the Secretary's unexplained failure to provide Matthews a requested hearing and the fact that the Garden Gate Manor SNF discharge issue was ultimately presented to the Secretary and considered by him in the ALJ's April 20, 2000 decision on whether Matthews was entitled to coverage for the full period of his stay at Gardens at Manhattan SNF, we, like the District Court, do not reject plaintiffs' claim for failure to exhaust administrative remedies. See Mathews v. Eldridge, 424 U.S. 319, 328, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (providing that under the exhaustion requirement of 42 U.S.C. § 405(g), "[t]he waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted" and that "[t]he nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary"); see also Heckler v. Ringer, 466 U.S. 602, 618, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) ("[I]n certain special cases, deference to the Secretary's conclusion as to the utility of pursuing the claim through administrative channels is not always appropriate."); City of New York v. Heckler, 742 F.2d 729, 736 (2d Cir.1984) (commenting that judicial waiver of 42 U.S.C. § 405(g)'s exhaustion requirement may be appropriate where "plaintiff's legal claims are collateral to the demand for benefits").
 
 
 [9]
 Even if the alleged breach of the covenant of good faith and fair dealing could serve to augment the number of days of SNF coverage to which Matthews was entitled under the Subscriber Agreement, the ALJ's conclusion that Senior Choice satisfied its obligation to Matthews under the Subscriber Agreement would still be supported by substantial evidence—specifically, the progress note of Dr. Margaret Mitchell, who wrote on December 15, 1997, the day that Matthews was released from Garden Gate Manor SNF, that Matthews was "doing well at this point" and "no longer needs rehab as his ambulation is good and [he] is not in need of . . . skilled nursing care."See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir.2000) ("Substantial evidence `means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971))).
 
 
 [10]
 We intimate no view as to whether the ALJ's inability to hear Matthews's common law breach of contract claim for damages indicates that the claim would be cognizable in a suit brought independently of 42 U.S.C. § 405(g)See 42 U.S.C. § 405(h) (made applicable to the Medicare Act by 42 U.S.C. § 1395ii and providing that 42 U.S.C. § 405(g) sets forth the sole means for judicial review of "claim[s] arising under" the Medicare Act); see also Heckler, 466 U.S. at 614, 615, 104 S.Ct. 2013 (noting that the "claim arising under" language of § 405(h) is to be construed "quite broadly" and includes claims that are "inextricably intertwined" with claims for benefits under the Medicare Act, as well as "any claims in which both the standing and the substantive basis for the presentation of the claims is the Social Security Act" (internal quotation marks omitted)); RenCare, Ltd. v. Humana Health Plan of Tex., Inc., 395 F.3d 555, 557 (5th Cir.2004) (applying the Heckler test to common law claims); Ardary v. Aetna Health Plans of Calif., Inc., 98 F.3d 496, 499-500 (9th Cir.1996) (same).
 We do note, however, that at oral argument counsel for the Secretary argued that the Estate could pursue its breach of contract action for damages in state court. In other words, the Secretary effectively agreed that Matthews's breach of contract claim for damages does not arise under the Medicare Act because, according to the Secretary, Matthews's claim would be cognizable outside the context of a suit brought pursuant to 42 U.S.C. § 405(g), which provides United States district courts exclusive original jurisdiction over § 405(g) actions.