**Rosalie JOHNSON, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 07 Civ. 2839(GWG).**

United States District Court,
S.D. New York.

June 26, 2008.

Rosalie Johnson, New York, NY, Pro Se.

John E. Gura, Jr., U.S. Attorney's Office, Southern District of New York, New York, NY, for Defendant.

## OPINION AND ORDER

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiff Rosalie Johnson brings this action *pro se* on behalf of her grandson, Theorian Johnson, to review the final decision of the Commissioner of Social Security (the "Commissioner") finding that Theorian is ineligible for Supplemental Security Income ("SSI"). The Commissioner has moved for judgment on the pleadings and dismissal pursuant to Fed.R.Civ.P. 12(c).

The parties have consented to this matter being determined by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's motion is granted.

## I. BACKGROUND

### A. Procedural History

Johnson filed for disability benefits on behalf of her grandson on April 27, 2004. *See* Administrative Record (annexed to Answer, filed Sept. 5, 2007 (Docket # 6)) ("R."), at 49–51, 67. Her application was denied on July 16, 2004. R. 24–28. Johnson requested a hearing before an Administrative Law Judge ("ALJ"), R. 29, and a hearing was held on January 24, 2006, R. 489–510. The ALJ found that Theorian was not disabled, R. 7–20, and the Appeals Council denied Johnson's request for review on February 6, 2007, R. 4–6. Johnson timely filed this action on April 9, 2007. *See* Complaint, filed Apr. 9, 2007 (Docket # 2).

### B. Written Statements and Testimony

Johnson's written statements and testimony showed the following:

Theorian was born on April 25, 1997, R. 49, and has lived with Johnson since he was two months old, R. 120. Johnson described Theorian's disabilities as consisting of, "Asthma, expressive language delay and emotional problems. He also has [Attention Deficit Hyperactivity Disorder ("ADHD")] and a skin condition. Without medication he is very hyperactive and does not behave or follow rules." R. 62.

With regard to Theorian's behavior, Johnson stated that while he is "a bright and happy child willing to learn," he has "discipline problems in school [and Johnson is] in daily contact with his teacher about behavior." R. 81. Theorian "gets agitated when he gets upset with his

peers. He likes to play by himself. He has an [individualized education program ("IEP")] with the [Board of Education] to help him with his socialization. He gets along with adults." R. 80.

With regard to Theorian's speaking abilities, Johnson stated that he "has problems with some sounds. He is in speech education with the [Board of Education] with the IEP to help him with his speech since he was three years old." R. 80. Theorian has been diagnosed as learning disabled, R. 494, and has trouble writing and memorizing, R. 495.

Theorian has been hospitalized for problems with asthma at least once. R. 496–97. His asthma is fairly well controlled with medication and a care plan. R. 496–97.

Theorian testified at the hearing before the ALJ. *See* R. 499–504. Among other facts about his life and interests, he stated that school is "pretty good," reading is his "favorite," R. 500, he uses a computer at school, R. 501, and he likes to play volleyball and basketball in gym class, R. 502.

### C. *Health Records*

Theorian has received treatment at the Center for Comprehensive Health Practice ("CCHP") since October 2003. R. 103. He was diagnosed with ADHD in December 2003. R. 103. As of July 2004, he continued to receive weekly "play therapy" with Dr. Mary Ellen Fahs, a psychologist, and to be seen on a monthly basis by the staff psychologist, Dr. Andrea Clair, for "medication management." R. 104.

Dr. Fahs and another psychologist at CCHP, Dr. Lai Ping Lew, completed a report in May 2004, R. 90–94, diagnosing Theorian with ADHD and chronic asthma, R. 90. They indicated that his symptoms consisted of "hyperactivity, difficulty focusing and paying attention in school; sad-

ness; anxiety regarding biological mother and treatment of half-siblings." R. 90. While they noted that Theorian's "fine/gross motor skills," "sensory abilities," and "communication skills," were "age appropriate," they indicated that he was not functioning at an age appropriate level socially and emotionally in that he "has some difficulty interacting with peers—social development somewhat delayed." R. 91–92. They also described his cognitive skills as age appropriate, although "perhaps somewhat delayed." R. 92. Drs. Lew and Fahs noted that Theorian was expelled by the private school in which he had been enrolled due to disruptive behavior, but that Straltera—apparently a drug used for treating ADHD—improved Theorian's behavior and made him calmer. R. 91. The doctors stated that Theorian's "acting-up and displaying of anxiety" coincided with scheduled visits with his biological mother, but that those visits had been discontinued by court order. R. 91. In August 2004, Dr. Fahs noted that "Theorian presents now as less hyperactive and less anxious." R. 244.

At various points Dr. Clair has prescribed the medications Prozac, Risperdol, Ritalin, and Concerta for Theorian. R. 276–77, 280, 287, 289–90; *see also* R. 189–96.

Theorian had acute asthmatic episodes in January and December of 2003. R. 93; *see also* R. 96–98. In a report of November 2005, Dr. Lew noted that Theorian continues to have "intermittent episodes of asthma exacerbation necessitating short courses of oral steroids despite using maintenance therapy." R. 334. Theorian periodically suffers from eczema and rashes. *See* R. 267, 278, 295.

In her November 2005 report, Dr. Lew diagnosed Theorian with asthma, attention deficit disorder, post-traumatic stress dis-

order, adjustment disorder, and a learning disability. R. 334.

### D. *School Records and Speech Evaluations*

In December 2003, speech and language pathologist Eurydice Damianos recommended that Theorian be "discharged from therapy since his receptive and expressive and speech skills are appropriate for his age." R. 162. She also noted that he "demonstrated adequate attention and cooperative skills in therapy sessions." *Id.* In February 2004, Holly Goldstein, a speech therapist at Theorian's school, reported that Theorian had "achieved all of his expressive and receptive language goals," and that his abilities in these areas were "at the upper-limits of normal." R. 122. Despite his progress, however, the therapy was continued at Johnson's request and based on reports from his classroom teacher of Theorian's social struggles. R. 122.

In June 2004, Theorian's first grade teacher, Donna Gross, indicated that Theorian had "no problem" in the domains of "acquiring and using information," R. 111; "moving about and manipulating objects," R. 114; and "caring for himself," R. 115. Gross indicated that Theorian had various problems in the domains of "attending and completing tasks," and "interacting and relating with others." R. 112–13. Gross wrote that Theorian "has difficulty staying on task and completing assignments on time ... [and] has difficulty (sometimes) getting along with other children and often teases or is physical towards them." R. 117.

In June 2004, Theorian was evaluated by Cristina Laureano, a speech and language pathologist. R. 197–200. She concluded that Theorian's "overall expressive language skills appeared to be close to age level.... Language abilities were found to be normal.... Communicative function was found to be normal...." R. 200.

In December 2004, the administration of Theorian's school requested that Johnson consent to Theorian's participation in "at-risk counseling services," which she did. R. 119.

In April 2005, Goldstein reported that Theorian's therapy continued due to "expressive language deficits mostly in written contexts," but that in the next school year he would "no longer receive speech and language services as he will receive special education teacher support services .... occupational therapy ... and counseling," and thus his "social, emotional and academic needs should be met without speech and language services." R. 123; *see also* R. 128–29.

An April 2005 evaluation recommended that Theorian receive occupational therapy "to address primary issue of distractibility to all auditory and visual stimuli, work behaviors and task initiation, completion, independence; graphomotor skills which are below age level likely due to focus and organization difficulties." R. 127. The evaluation noted that although Theorian's "graphomotor ... skills are below age expectations, they are generally adequate ... [and] within normal limits." R. 127.

A Department of Education IEP was created for Theorian in April 2005, which called for Theorian to receive special education support services in a general education classroom, occupational therapy, and counseling. R. 137. The evaluations included with the IEP noted that Theorian continued to have "mild difficulty in expressive language skills" and "great difficulty independently reading and working," although his "comprehension in reading tasks is on grade level." R. 139. The evaluation also noted that Theorian contin-

ued to have difficulty interacting with his classmates. R. 140; *see also* R. 152.

In July 2005, Theorian was evaluated by occupational therapist Jennifer Lewin at the request of the Board of Education. *See* R. 217–19. She concluded that Theorian "demonstrates delayed fine motor skills and age-appropriate visual-motor integration skills. [He] also demonstrates hyperaroused and hyperactive behavior and limited attention span. These deficits severely affect Theorian's ability to successfully complete age-appropriate tasks." R. 219.

Theorian's first term, third grade report card from 2005 indicated that he was "at risk of not meeting promotional standards." R. 348. Theorian was removed from the third grade and placed in second grade "due to difficulties coping in the [third] grade classroom." R. 384. Theorian was placed in the second grade class of teacher Jamie Frost. She indicated that he was "below average" in reading, writing, and math. R. 379. She also indicated that his "communication" skills were "average," but that his "attention/concentration" and "social/emotional" skills were "below average." R. 380. Frost noted that Theorian is "[a]lways silly and seeking other kids attention (negative attention usually). [He has] trouble relating to other kids." R. 380.

In December 2005, Theorian was evaluated by psychologist Sabrina Crouch. R. 438–42. She concluded that

> Theorian is capable both cognitively and academically and should be challenged. Currently his cognitive functioning ... was within the low average range ... however this score should be interpreted with caution due to areas of pronounced strengths and weaknesses within his profile. Theorian's processing speed is significantly weakened by his attention difficulties. Theorian's academic achievement ... was within the high average range ... indicating that he is capable of performing academic tasks on a [third] grade level.... Theorian presents as friendly and polite. He presents with Attention Deficit Hyperactivity Disorder which is interfering with his ability to perform up to his ability. Even when he is working [one-on-one] with the examiner he required constant redirection, feedback, and structure. He is aware that his behavior is inappropriate; however he has little insight or ability to control it.

R. 442.

An evaluation done by Sandra Robinson of the Committee of Special Education for Region 9 in January 2006 found Theorian's language development to be "poor to below average." R. 381. The report noted that Theorian was in a "general education" program, R. 381, and recommended he receive speech and language services, R. 383.

In January 2006, school therapist Mimi Greenberg reported on Theorian's occupational therapy progress. R. 384–85. She noted that "Theorian has spent much of the year exhibiting extreme off-task behaviors, inability to initiate [and] perform school tasks, behavior disruptive to others in class.... It is believed that significant emotional and mental health concerns are impeding Theorian's overall well-being and performance in school." R. 384–85.

Theorian's special education teacher also noted Theorian's continued academic and social difficulties in January 2006. R. 386–88.

In February 2006, Theorian's counselor indicated that "Theorian's communication and social skills still need improvement" and that in "several sessions Theorian has acted out inappropriately to get attention from peers and counselor by making strange noises, laughing for no reason and

dancing." R. 414. The counselor's report concluded that "Theorian will benefit from a more restrictive environment due to his lack of focus and writing skills." R. 414.

Theorian's IEP of March 2006, summarized the reports from his teachers and therapists and stated:

Theorian requires close supervision and a high level of intensive supports throughout the school day to address his comprehensive needs. He requires interactions with a speech therapist to assist him in strengthening expressive and receptive language skills. He also requires interactions with a counselor to assist him in developing more effective coping skills as well as occupational therapy to strengthen his fine muscles.

R. 395–96. The IEP concluded that any modification of a general education program would be insufficient to meet Theorian's needs. R. 412. The IEP called for Theorian to be placed in a "special class in a special school," but stated that he does not need to be placed in a "residential treatment center" because "he does not require intensive supervision and a therapeutic milieu for the entire 24 hour day." R. 412.

Theorian's IEP of April 2006 repeated verbatim the summary in the March 2006 report, R. 453, but added that Theorian's "behavior does not seriously interfere with instruction and can be addressed by the general education and/or special education classroom teacher," R. 454. The IEP calls for a special education teacher, speech therapist, occupational therapist, and counselor to assist Theorian's classroom teacher. R. 464.

### E. Consulting Physician Reports

Dr. Ioanis Atoynatan, a consulting pediatrician, examined Theorian in June 2004. R. 202–06. He diagnosed Theorian with a "history of attention deficit hyperactivity disorder," "history of asthma," and "apparent skin condition compatible with eczema." R. 205. Dr. Atoynatan concluded that Theorian's "ability to do age-appropriate activities and behave in an age-appropriate manner . . . seems to be moderately affected," and that his behavior, asthma, and skin condition "are all significant. . . . [but] stable." R. 206.

Consulting psychologist Dr. H. Walslak examined Theorian in June 2004. R. 511–14. He found "no evidence of acute hyperactivity, although there was a slight degree of restlessness. Overall attention span and concentration seemed adequate." R. 512. Dr. Walslak found that Theorian was "able to attain age appropriate academic achievement levels. Functional daily living skills are at age appropriate levels. Social and emotional status is stable. . . . Today's findings do not support allegations of emotional problems. [Theorian's] ADHD appears to be responding to a medication regimen." R. 513.

In July 2004, Dr. J. Randall reviewed the record in order to assess Theorian's impairments. R. 208–12. He concluded that Theorian either had "no limitation" or a limitation that was "less than marked" in the six domain areas of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," "moving about and manipulating objects," "caring for yourself," and "health and physical well being." R. 209–10.

### F. ALJ's Opinion

Relying on the treatment records, the ALJ found that Theorian "has the following severe impairments: attention deficit hyperactive disorder (ADHD), speech and language delays, learning disability, asthma and eczema." R. 12. The ALJ also found, however, that none of these impair-

ments or their combination "meets or medically equals one of the listed impairments in" the regulations. R. 13.

In considering whether any of Theorian's impairments met a listed impairment, the ALJ considered listings 3.03, 12.02, and 12.10 [1] of Part 404, Subpart P, Appendix 1 of the Social Security Administration regulations. R. 13. With regard to Theorian's asthma, the ALJ considered listing 3.03 and concluded that Theorian's asthma "does not even begin to approach the level of severity required to meet that listing." R. 13.

In considering Theorian's speech and language delay, the ALJ looked to listing 12.02. R. 13. The ALJ found that Theorian's speech and language impairment did not meet Part A of the 12.02 listing standard because his impairment is not "persistent" and it can be "resolved or bettered with therapy." R. 13. He also found that Theorian's speech impairment did not meet Part B of listing 12.02 because Theorian "does not demonstrate marked limitations in at least two of the four listed functions," but only exhibits a "notable limitation ... with the function of maintaining concentration." R. 13.

As to whether Theorian's ADHD constituted a disabling impairment, the ALJ found that it did not meet the standard of listing 12.10 because Theorian "does not have the three marked limitations to meet Part A." R. 13.

The ALJ then considered whether Theorian's impairments functionally equal any of the listings, R. 13, by assessing Theorian's functioning in terms of the six domains listed in 20 C.F.R. § 416.926a(b)(1). The domains listed in 20 C.F.R. § 416.926a(b)(1) are: (1) acquiring and using information; (2) attending and com-

pleting tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. Under 20 C.F.R. § 416.926a(d), an individual must have a marked limitation in two of the domains or an extreme limitation in one domain to be considered disabled. The ALJ concluded that Theorian has a marked limitation in "attending and completing tasks," R. 16, but that any limitation in the other domains was less than marked, R. 15–20.

## II.  APPLICABLE LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

■ A court reviewing a final decision by the Commissioner pursuant to 42 U.S.C. § 405(g) must first determine whether the Commissioner applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). If the Commissioner failed to apply the correct legal standard in making a determination, the reviewing court must not defer to the Commissioner's decision. *See Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) ("Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

■ In addition, a reviewing court must also determine whether the decision is supported by substantial evidence. *See, e.g., Acierno v. Barnhart,* 475 F.3d 77, 80–81 (2d Cir.) (citing *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir.2004)), *cert. denied,* — U.S. ——, 127 S.Ct. 2981, 168 L.Ed.2d 704 (2007); *Tejada,* 167 F.3d at 773; *see generally* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclu-

---

1.  While the ALJ's decision indicated that listing "12.11" was the listing used to evaluate Theorian's ADHD, a reference to listing 12.10 was obviously intended.

sive....""). "Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *accord Matthews v. Leavitt*, 452 F.3d 145, 152 n. 9 (2d Cir.2006); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000).

■ If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See generally Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.") (citation omitted). "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).

B. *Legal Standard Governing Evaluation of Disability Claims for Children*

To qualify for SSI, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 1382c(a)(3)(C)(i). The Social Security Regulations provide a three-step sequential analysis to determine whether a child is disabled and eligible for SSI. 20

C.F.R. § 416.924(a)-(d); *see Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir.2004). First, the ALJ is to consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." *Id.* at § 416.924(c). Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically" or "functionally" equals a disability listed in the regulatory "Listing of Impairments." *Id.* at 416.924(c), (d); *id.* at Pt. 404, Subpt. P, Appendix 1.

In order to demonstrate functional equivalence, the child must exhibit "marked" limitation in two of six functional domains described in the regulations, or "extreme" limitation in one of the domains. *Id.* at § 416.926a(a); *see Pollard*, 377 F.3d at 190. The first five domains consider the child's ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and care for oneself. *Id.* at § 416.926a(b)(1). The sixth domain considers the child's health and physical well-being. *Id.*

An individual has a "marked" limitation when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation ... means a limitation that is 'more than moderate' but 'less than extreme.'" *Id.* An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* at § 416.926a(e)(3)(i).

III. *DISCUSSION*

The Commissioner has moved for judgment on the pleadings on the ground that

the ALJ properly found that Theorian is not disabled. *See* Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Nov. 28, 2007 (Docket # 14). Johnson has filed an affirmation in opposition to the Commissioner's motion, stating that she does not agree with the Commissioner's denial of SSI for Theorian. *See* Affirmation in Opposition to Motion, filed Dec. 20, 2007 (Docket # 16). Her affirmation consists largely of descriptions regarding Theorian's current behavioral problems at home and at school, with attached school records. *See id.* To the extent Johnson means this submission to show that there has been a change in Theorian's condition that would now justify classifying him as disabled, Johnson is of course free to file a new application for disability benefits with the Social Security Administration based on a period later than that covered in the ruling under review.

A. *The ALJ Followed the Correct Legal Standard*

█ The ALJ followed the correct legal standard by applying the three-step analysis of 20 C.F.R. § 416.924(a). *See, e.g., Foggie v. Barnhart,* 2005 WL 2260294, at *7 (S.D.N.Y. Sept. 12, 2005) (concluding that the ALJ applied correct legal standard by following 20 C.F.R. § 416.924(a)).

B. *Medical Equivalency to Listed Impairments*

█ We first examine whether there was substantial evidence supporting the ALJ's conclusion that Theorian's impairments do not medically equal impairments listed in the regulations. The ALJ used listing 3.03 of Part 404, Subpart P, Appendix 1 of the Social Security Regulations to determine whether Theorian's asthma constituted a disability. R. 13. Listing 3.03 requires "[a]ttacks . . . in spite of pre-

scribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year." The record shows that Theorian had two "acute episodes" in the year and a half prior to his application for benefits. R. 93. He was last hospitalized for asthmatic attacks in 2004, and his medication has lessened the severity and frequency of attacks. *See* R. 202–03, 206, 334, 496–97. Thus, there is substantial evidence supporting the ALJ's finding that Theorian's asthma does not medically constitute a disability.

█ The ALJ used listing 12.02 to assess Theorian's speech and language impairment. R. 13. Listing 12.02 requires:

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

As to Part A of the definition, Theorian has not shown a persistence of any of the described symptoms, and thus Part B does not need to be assessed. As to Part C, Theorian has not experienced repeated episodes of decompensation, a residual disease, or an inability to function outside a highly supportive living arrangement. Thus, there is substantial evidence supporting the ALJ's finding that Theorian's speech and language impairments do not medically constitute a disability.

■ The ALJ used listing 12.10 to evaluate Theorian's ADHD. R. 13. Listing 12.10 requires:

A. Medically documented findings of the following:

\* \* \*

2. For other pervasive developmental disorders, both of the following:

a. Qualitative deficits in reciprocal social interaction; and

b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The record does not show that Theorian's impairments are characterized by these descriptions. Thus, there is substantial evidence to support the ALJ's finding that Theorian's impairments do not medically equal a listed impairment.

### C. *Functional Equivalency to Listed Impairments*

We next examine the ALJ's conclusions with regard to Theorian's limitations in the six functional domains to determine whether there is substantial evidence for the ALJ's conclusion that Theorian's impairments do not functionally equal any of the listed impairments.

### 1. *Acquiring and Using Information*

■ The regulations describe the appropriate functioning of a child between the ages of six and twelve in the domain of acquiring and using information as follows:

[The child] should be able to learn to read, write, and do math, and discuss

history and science. [The child should be able] to us these skills in academic situations to demonstrate what [he or she has] learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. [The child should be able] to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change.) [The child should be able] to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [his or her] own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). The record shows that while Theorian is somewhat behind his age group academically, this is mainly due to his ADHD and general difficulty focusing on tasks, *see* R. 139, 206, 209–10, 380, 442, as opposed to his ability to acquire and use information. His first grade teacher noted he had "no problems" acquiring and using information. R. 111. Thus, while Theorian may have some limitations academically, there is substantial evidence to support the ALJ's conclusion that Theorian has a less than marked limitation in this domain.

### 2. *Attending and Completing Tasks*

■ The appropriate functioning of a child between the ages of six and twelve in the domain of attending and completing tasks is described as follows:

[The child] should be able to focus [his or her] attention in a variety of situations in order to follow directions, remember and organize [his or her] school materials, and complete classroom and homework assignments. [The child] should be able to concentrate on details and not make careless mistakes in [his or her] work (beyond what would be expected in other children [of the same] age who do not have impairments). [The child] should be able to change [his or her] activities or routines without distracting [him or herself] or others, and stay on task and in place when appropriate. [The child] should be able to sustain [his or her] attention well enough to participate in group sports, read by [him or herself], and complete family chores. [The child] should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv). The ALJ found that Theorian has a marked limitation in this domain. R. 17. The ALJ concluded that Theorian's limitations in this domain were not "extreme" because "records from [Theorian's] therapy sessions in 2004 and 2005 show significant improvement." R. 17. The records to which the ALJ referred are notes made by Dr. Clair, who is responsible for Theorian's medication management. In January 2005, she noted "[Patient's] mo [sic] reports that Theorian is doing much better except in mid-morning; teacher's chart confirms this.... Cooperative, but a little restless when working on homework. Cheerful." R. 283. Then in August 2005, she noted, "Theorian is doing well in summer camp, is more cooperative at home.... At home, he is studying, reading, problem solving and times tables [sic]. He is concentrating better.... Theorian is happy, playful. Constructs garage out of Lego pieces. He says he likes camp, has friends." R. 268. On the other hand, notes from Dr. Fahs indicate that Theorian's behavior had not improved. *See* R. 227 ("play was generally violent and disrespectful of people"); R. 228 ("behavior had

deteriorated"). Further, there are school and medical records describing Theorian as having great trouble focusing, and which indicate that this difficulty concentrating is a major cause of his academic struggles. *See* R. 139, 206, 209–10, 380, 442. School records from the 2005–06 school year indicate that any improvement in Theorian's ability to concentrate exhibited at summer camp did not translate into similar success in the classroom setting during the following school year when he had to be demoted to the second grade. R. 384.

While the record indicates that Theorian's difficulties focusing are a major source of his academic struggles, *see* R. 442, Dr. Fahs and Lew stated that the ADHD drug Straltera improved Theorian's behavior and made him calmer, R. 91, and Dr. Fahs later indicated that "Theorian presents now as less hyperactive and less anxious." R. 244. The consulting psychologist, Dr. Walslak, found following an examination "no evidence of acute hyperactivity, although there was a slight degree of restlessness. Overall attention span and concentration seemed adequate." R. 512. Dr. Walslak concluded that Theorian "is able to attain age appropriate academic achievement levels. Functional daily living skills are at age appropriate levels. Social and emotional status is stable.... Today's findings do not support allegations of emotional problems. [Theorian's] ADHD appears to be responding to a medication regimen." R. 513.

The question here is whether there is substantial evidence in the record to support the ALJ's conclusion that Theorian's limitations in this domain are "marked" and thus "seriously" interfere with his abilities in this domain, 20 C.F.R. § 416.926a(e)(2)(i), rather than "extreme" or "very seriously" interfering, *id.* at

§ 416.926a(e)(3)(i). Determining whether a condition "seriously" interferes as opposed to "very seriously" interferes with functioning obviously presents a challenge. The regulations provide some clue, however, as to the difference in meaning of these terms.

The regulations provide that a "marked" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). The percentage of a group that scores two or more standard deviations below the mean in normally distributed data (which is the sort of data we would expect on a standardized test) represents only 2.3% of the population. *See generally* J.L. Devore & K.N. Berk, *Modern Mathematical Statistics with Applications,* 787 (2007). In other words, in a group of 100 children evaluated in a domain, only the worst performing two children would be considered to have a "marked" limitation under the definition. The remaining 98 children would not have a "marked" limitation.

The regulations provide that an "extreme" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.* at § 416.926a(e)(3)(i). This definition of "extreme" thus dramatically narrows the scope of eligible persons. The percentage of a group that scores three standard deviations below the mean in normally distributed data represents only 0.13% of the population. *See generally* J.L. Devore & K.N. Berk, *Modern Mathematical Statistics with Applications,* 787 (2007). In other words, in a group of 1000 children evaluated in a domain, only the worst performing child would be considered to have an "extreme"

limitation. The remaining 999 children would not, under this definition, be considered to have an "extreme" limitation.[2]

In light of the evidence in the record, the ALJ's conclusion that Theorian did not have an "extreme" limitation is consonant with the definition of this term in the regulations inasmuch as substantial evidence supported the view that Theorian's inability to function was not so extreme as to be the "equivalent of" the performance of the bottom-performing child out of 1,000 children on a standardized test. Thus, the ALJ could properly conclude that Theorian's limitations only "seriously" interfered with his abilities in this domain and did not "very seriously" interfere with them.

3. *Interacting and Relating with Others*

■ The regulations describe the appropriate functioning of a child between the ages of six and twelve in the domain of acquiring and using information as follows:

> [The child] should be able to develop more lasting friendships with children who are [his or her] age. [The child] should begin to understand how to work in groups to create projects and solve problems. [The child] should have an increasing ability to understand another's point of view and to tolerate differences. [The child] should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). In finding that Theorian "has less than marked limitation in interacting and relating with others," the ALJ stated that the record was "sometimes inconsistent on this issue." R. 17. He noted that while Theorian has "mild to moderate speech and language problems, ... the record also shows that he has met many speech and language goals and that his speech abilities are within normal limits." R. 17 (citing R. 159–62, 200). The ALJ also noted that Theorian's March 2006 IEP states that Theorian has many friends and is well liked by his peers, R. 397, while a report from his teacher in 2005 had made the opposite observation, R. 362. The ALJ also cites the statement by a Board of Education therapist that Theorian is "a mannerly and polite boy who readily engage[s] in conversation," R. 383, as well as a statement of one of Theorian's teachers describing him as "a very caring student [who] is always asking for things he can do to help out in the classroom," R. 435. These are two examples of statements from adults who have observed that Theorian is often "polite" to adults in formal situations, and expresses good intentions with regard to his behavior towards others. Thus, while a good portion of the record shows that Theorian has difficulty forming and maintaining healthy friendships among his peers, it was not unreasonable for the ALJ

---

**2.** Some cases have used the figures 5% and 1% (rather than 2.3% and .13%) for the number of individuals in these categories. *See, e.g., Rex, ex rel. A.R. v. Astrue*, 2007 WL 4353668, at *2 (D.N.H. Dec. 10, 2007). The confidence interval for two standard deviations is approximately .95449 and for three standard deviations is .99730. *See* D. Freedman *et al., Statistics*, A–70 (1978). Putting aside the issue of the errors introduced based on rounding, it is not accurate to extrapolate from these figures that 5% of scores are below two standard deviations. While it is accurate that 95.449% of scores are *within* two standard deviations, such a statement does not account for the approximately 2.3% of scores (100 minus 95.4497 divided by 2) that are *above* two standard deviations. (The same is true for the analysis of three standard deviations.) One case seems to recognize this, though it uses 2.5% for the two-standard-deviation figure (and, for reasons this Court does not understand, uses 0.5% for the three-standard-deviation figure). *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir.2003).

to balance this evidence against the evidence of Theorian's polite and helpful behavior with adults, and the evidence that he is sometimes socially successful among his peers, in drawing the conclusion that any impairment Theorian has in this domain is not greater than moderate.

#### 4. *Moving About and Manipulating Objects*

The regulations describe the appropriate functioning of a child between the ages of six and twelve in the domain of moving about and manipulating objects as follows:

> [The child's] developing gross motor skills should let [him or her] move at an efficient pace about [his or her] school, home and neighborhood. [The child's] increasing strength and coordination should expand [his or her] ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls in informal play or organized sports. [The child's] developing fine motor skills should enable [him or her] to do things like use many kitchen and household tools independently, use scissors, and write.

20 C.F.R. § 416.926a(j)(2)(iv). As to this domain, the ALJ's finding that Theorian "shows no significant limitations," R. 18, is supported by substantial evidence. Although Theorian receives occupational therapy at school, several reports in the record indicate that his fine and gross motor skills are within normal limits. *See* R. 91, 114, 127. Furthermore, records from Theorian's day camp indicate that he swims and plays ball, R. 324, and Theorian testified that he enjoys playing volleyball and basketball in gym class, R. 502. Therefore, it was reasonable for the ALJ to conclude that Theorian did not suffer from any significant limitations in this domain.

#### 5. *Caring for Yourself*

There is no evidence to suggest that Theorian has any problem in this domain.

#### 6. *Health and Physical Well–Being*

It was reasonable for the ALJ to conclude that Theorian has "less than marked limitation," R. 20, in this domain. While Theorian has asthma that must be monitored and managed, his health records indicate that he is a "well child," R. 425, and a "basically healthy youngster," R. 455. He has had acute asthmatic episodes in the past, but the record shows that the severity and frequency of such episodes has been reduced with proper medication and monitoring. R. 202–03, 334.

### D. *New Evidence*

Johnson's affirmation includes anecdotes and further school records that appear to indicate that Theorian's condition may have worsened since the hearing before the ALJ in January 2006. The Commissioner concedes as much, *see* Reply Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, filed Jan. 25, 2008 (Docket # 19), at 2–3, but asserts that "the incidents . . . appear to have occurred recently and do not relate to the period under review by this Court. . . . [and thus] are not material and . . . do not provide a basis for remand," *id.* at 3.

A court may remand a case to the Commissioner for consideration of new evidence if that evidence is material, meaning that it is new and not merely cumulative of the evidence already in the record, and there was good cause for the failure to submit it in prior proceedings. *See* 42 U.S.C. § 405(g); *Pollard*, 377 F.3d at 193;

*Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Pollard*, 377 F.3d at 193. Further, such evidence must be probative and relevant to the alleged condition during the claimed period of impairment prior to ALJ's decision. *See id.* Evidence generated after the ALJ issued his decision can be material if it suggests that during the relevant time period, the claimant's condition was more serious then previously thought. *Id.*

■ The new evidence Johnson included in her affirmation refers to Theorian's behavior and performance during the 2007–08 school year. This is after the ALJ's decision, and thus does not concern the time period relevant to the instant SSI claim and appeal. There is no reason to believe this evidence casts light on the nature of Theorian's difficulties during the period under review. Thus, remand for consideration of this evidence is not appropriate. As previously noted, a new application for disability benefits may be filed with the Social Security Administration based on a period later than that covered in the ruling under review.

*Conclusion*

The Commissioner's motion judgment on the pleadings (Docket # 13) is granted, and the case is dismissed. The Clerk is requested to enter judgment and to close this case.