**20-1642-cv**
*Barrows v. Becerra*

# In the
# United States Court of Appeals
# For the Second Circuit

————

AUGUST TERM 2021

ARGUED: OCTOBER 6, 2021
DECIDED: JANUARY 25, 2022

No. 20-1642-cv

Lee Barrows, on behalf of herself and all others similarly situated, Michael Savage, on behalf of himself and all others similarly situated, George Renshaw, on behalf of himself and all others similarly situated, Shirley Burton, on behalf of herself and all others similarly situated, Denise Rugman, on behalf of herself and all others similarly situated, Ann Pelow, Executor of the Estate of Richard Bagnall, James Mulcahy, Executor of the Estate of Sarah Mulcahy,
*Plaintiffs-Appellees*,

Brenda Hardy, Executrix of the Estate of Loretta Jackson, Gary Goodman, Estate of Dorothy Goodman, Christina Alexander, Representative of the Estate of Bernice Morse, Mary Smith, Representative of the Estate of Martha Leyanna, Peggy Leider, for Irma Becker, William Hodges, for Louis Dziadzia, Michael Holt, Executor of the Estate of Charles Holt,
*Intervenors-Plaintiffs-Appellees*,

Richard Bagnall, on behalf of himself and all others similarly situated, Sarah Mulcahy, on behalf of herself and all others similarly situated,
*Plaintiffs*,

Jessie Ruschmann, Representative of the Estate of Frederick
Ruschmann, Bernice Morse, Frederick Ruschmann, Louis Dziadzia,
Loretta Jackson, Martha Leyanna, Charles Holt, on behalf of
themselves and all others similarly situated, Irma Becker, Dorothy
Goodman, on behalf of herself and all others similarly situated,
*Intervenors-Plaintiffs*,

*v.*

Xavier Becerra, Secretary of Health and Human Services,
*Defendant-Appellant*.*

————

Appeal from the United States District Court
for the District of Connecticut

————

Before: WALKER, CALABRESI, AND CABRANES, *Circuit Judges*.

————

The plaintiff-appellee class members are Medicare Part A
beneficiaries who are formally admitted to a hospital as "inpatients"
before their subsequent reclassification as outpatients receiving
"observation services." Plaintiffs brought this suit alleging, *inter alia*,
that defendant-appellant Xavier Becerra, the Secretary of the United
States Department of Health and Human Services ("HHS"), violates
their due process rights by declining to provide them with an
administrative review process for the reclassification decision.
Following a bench trial, the United States District Court for the
District of Connecticut (Michael P. Shea, *J.*) entered an injunction that
ordered the creation of such a process. On appeal, the Secretary
challenges: (1) the finding that the plaintiff class had standing, (2) the

---

\* The Clerk of Court is directed to amend the caption as set forth above.

certification of the plaintiff class, and (3) the conclusion that plaintiffs' due process rights are violated by the current administrative procedures available to Medicare beneficiaries.  For the reasons that follow, we find no merit in these challenges.  We therefore **AFFIRM**.

————

ALICE BERS (Wey-Wey Kwok, *on the brief*), Center for Medicare Advocacy, Willimantic, CT; David J. Berger, Steven Guggenheim, *on the brief*, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Regan Bailey, Carol Wong, *on the brief*, Justice in Aging, Washington, D.C., *for Plaintiffs-Appellees and Intervenors-Plaintiffs-Appellees*

ADAM C. JED (Michael S. Raab, *on the brief*), Attorneys, Appellate Staff, *for* Brian M. Boynton, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *for Defendant-Appellant*

M. Geron Gadd, Kelly Bagby, William Alvarado Rivera, *on the brief*, AARP Foundation, Washington, D.C.; Kasey Considine, *on the brief*, Disability Rights Connecticut, Hartford, CT, *for amici curiae AARP, AARP Foundation, National Disability Rights Network, and Disability Rights Connecticut*

Erin G. Sutton, *on the brief*, American Medical Association, Chicago, IL, *for amici curiae The American Medical Association and Connecticut State Medical Society*

James F. Segroves, *on the brief*, Reed Smith LLP, Washington, D.C., *for amicus curiae The American Health Care Association*

_____

JOHN M. WALKER, JR., *Circuit Judge*:

The plaintiff-appellee class members are Medicare Part A beneficiaries who are formally admitted to a hospital as "inpatients" before their subsequent reclassification as outpatients receiving "observation services."  Plaintiffs brought this suit alleging, *inter alia*, that defendant-appellant Xavier Becerra, the Secretary of the United States Department of Health and Human Services ("HHS"), violates their due process rights by declining to provide them with an administrative review process for the reclassification decision. Following a bench trial, the United States District Court for the District of Connecticut (Michael P. Shea, *J*.) entered an injunction that ordered the creation of such a process.  On appeal, the Secretary challenges:  (1) the finding that the plaintiff class had standing, (2) the certification of the plaintiff class, and (3) the conclusion that plaintiffs' due process rights are violated by the current administrative procedures available to Medicare beneficiaries.  For the reasons that follow, we find no merit in these challenges.  We therefore **AFFIRM**.

## BACKGROUND

This eleven-year litigation stems from the different ways in which a Medicare beneficiary may be classified when she stays at a hospital.  Whether a hospital classifies her as an inpatient or an outpatient has major consequences in terms of the coverage provided by Medicare.  As a general matter, an inpatient's hospital and post-hospital extended care is eligible for coverage under Medicare Part A, while that of an outpatient is not.  Accordingly, a hospital's decision to reclassify a Medicare beneficiary from an inpatient to an outpatient in some cases will have a significant negative impact on the amount

of care a patient receives that Medicare will pay for. The plaintiffs here challenge the lack of a process to appeal that decision.

Given the underlying statutory complexities presented by this case, we begin by explaining the operation and costs related to both inpatient services that are covered under Medicare Part A and outpatient services that are not.

## I.       Statutory Overview

Medicare is a federally funded health insurance program for the elderly. One of its plans, Medicare Part A, "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care."[1] More specifically, Part A covers "inpatient hospital services," which includes both services "furnished to an inpatient of a hospital" and "post-hospital extended care," such as skilled-nursing facility ("SNF") care "after [a patient's] transfer from a hospital in which [she] was an inpatient for not less than 3 consecutive days."[2] Although "inpatient" is undefined in the Medicare statute, we have held that only a Medicare beneficiary who is "formally admitted" to a hospital can qualify as such.[3] Many Part A beneficiaries do not pay a premium to participate in the program.[4] However, when beneficiaries are admitted to the hospital as

---

[1] 42 U.S.C. § 1395c.

[2] *Id.* §§ 1395d(a), 1395x(b), 1395x(h), 1395x(i).

[3] *Est. of Landers v. Leavitt*, 545 F.3d 98, 111 (2d Cir. 2008); *see also* 42 C.F.R. § 412.3(a).

[4] Medicare General Information, Eligibility, and Entitlement Manual, CMS Pub. No. 100-01, Ch. 1, § 20.1 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c01.pdf (last visited Jan. 24, 2022).

inpatients, they are responsible for paying an inpatient deductible.[5]

By contrast, Medicare Part B is a program that covers outpatient services.[6] Those services can be provided both outside of a hospital setting, such as at a doctor's office, or within a hospital. The Centers for Medicare & Medicaid Services ("CMS"), a department of HHS that administers Medicare, defines a hospital outpatient as "a person who has not been admitted to the hospital as an inpatient" but receives services from the hospital.[7] One form of outpatient services is referred to as "observation services."[8] Observation services "include ongoing short term treatment, assessment, and reassessment before a decision can be made whether patients will require further treatment as hospital inpatients" or can be discharged.[9] Observation services may include the same services that are also provided to inpatients.[10]

Unlike Part A, Part B is a supplemental program for which Medicare beneficiaries must pay a monthly premium in order to participate.[11] Part B beneficiaries who receive observation services in

---

[5] 42 U.S.C. § 1395e. In 2018, the deductible for the first 60 days of an inpatient hospital stay was $1,340. App'x at 2582–83 (Medicare General Information, Eligibility, and Entitlement Manual, Ch. 3, § 10.3 (2018)).

[6] 42 U.S.C. § 1395k(a); *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006).

[7] App'x at 2082 (Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 6, § 20.2 (2015)).

[8] Observation services are also sometimes referred to as "observation status." We use these terms interchangeably.

[9] App'x at 2093.

[10] Some hospitals have dedicated observation units to provide observation services, but a majority do not distinguish between observation and inpatient services in terms of location and delivery of care. App'x at 2688–89.

[11] *Mathews v. Diaz*, 426 U.S. 67, 70 n.1 (1976).

a hospital must make a copayment of 20% of the cost of the services.[12] Part B beneficiaries receiving observation services, in contrast to inpatients covered under Part A, are also responsible for the cost of self-administered medications and any SNF care following hospitalization.[13]

After a hospital treats a Medicare beneficiary, it submits a claim for reimbursement to Medicare. If a hospital admits a beneficiary as an inpatient but Medicare believes that person should not have been formally admitted, Medicare will not reimburse the hospital under Part A. If Medicare initially reimburses the hospital, but upon further review, finds the admission to have been erroneous, Medicare will seek to recover its payment from the hospital.[14] A hospital can bill Medicare for observation services provided to a Part B beneficiary only after a physician has entered a formal observation order. Thus, if a hospital admits a patient as an inpatient and is later denied reimbursement by Medicare, it cannot reclassify the care provided to the patient as observation services and re-bill Medicare under Part B.[15] Medicare has historically reimbursed hospitals at a higher

---

[12] App'x at 2589 (Medicare General Information, Eligibility, and Entitlement Manual, Ch. 3, § 20.3). Since 2016, CMS has established a pre-set bundled cost for all covered observation services provided during most hospital stays. In 2018, the bundled cost was $2,349.66. App'x at 1527.

[13] 42 U.S.C. § 1395x(i) (SNF care is only covered by Medicare if it is provided "after transfer from a hospital in which [the patient] was an *inpatient* for not less than 3 consecutive days before his discharge") (emphasis added)). Medicare beneficiaries may pay out of pocket for such care or through non-Medicare insurance, such as commercial insurance, veterans' benefits, or Medicaid. App'x at 1529–30.

[14] App'x at 1710–11.

[15] Medicare Claims Processing Manual, Ch. 1, § 50.3.2 (2021), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c01.pdf (last visited Jan. 24, 2022) ("[I]n accordance with the general Medicare requirements for

average rate for Part A inpatient claims than for Part B observation services claims.

In reviewing a hospital's reimbursement submissions, CMS utilizes various private contractors to ensure that the claims are properly supported and payable under Medicare guidelines—that is, that a physician's order meets the coverage requirements for payment. In addition to their own clinical judgment, contractors may use commercial screening tools, manuals, or software, setting forth criteria for inpatient admissions, to identify claims for further review and to focus their efforts. And as a result of such reviews, CMS may subject hospitals to audits concerning their billing practices and may recoup past improper payments. Additionally, a hospital's inpatient claims can also be investigated by HHS's Office of the Inspector General and even by the Department of Justice. Finally, hospitals, but not plaintiff class members who, because of their reclassification never have a Part A claim submitted on their behalf to Medicare, may administratively appeal the denial of Part A reimbursement claims through a multi-level appeal system if CMS determines that an inpatient admission did not meet the criteria for Part A payment.[16]

---

services furnished to beneficiaries and billed to Medicare, . . . hospitals may not report observation services using [the observation services Medicare billing code] for observation services furnished during a hospital encounter prior to a physician's order for observation services. Medicare does not permit retroactive orders or the inference of physician orders."). A hospital may be able to re-bill Medicare under Part B for *other* types of outpatient services that had been provided to the patient. 42 C.F.R. § 414.5.

[16] A hospital may first ask for a redetermination from the same contractor that denied payment. It may then seek reconsideration by a different contractor. If a certain minimum amount-in-controversy is satisfied, then the hospital may appeal that second contractor's decision to an administrative law judge. In some instances the administrative law judge's decision may be appealed to the Medicare Appeals Council.

## II.    Classification Procedures

During the class period, January 1, 2009 to date, guidance from CMS regarding who should be admitted as an inpatient in order to receive Part A coverage changed.  Prior to 2013, CMS directed that "[p]hysicians should use a 24-hour period as a benchmark, i.e., they should order [inpatient] admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis."[17]  Physicians were also advised that "the decision to admit a patient is a complex medical judgment" and were instructed to consider a number of factors, including "the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting."[18]

In 2013, CMS promulgated its so-called "Two Midnight Rule," which stated that inpatient admission is generally appropriate for payment under Medicare Part A when the physician reasonably expects the patient to require medically necessary hospital care that will span two midnights after the patient arrives at the hospital.[19]  A patient's treating physician makes the initial status determination as to whether the patient will meet the Two Midnight Rule.  Physicians are instructed to apply the Two Midnight Rule "based on such complex medical factors as patient history and comorbidities, the severity of signs and symptoms, current medical needs, and the risk

---

Finally, if certain requirements are met, judicial review may also be available.  *See* 42 C.F.R. §§ 405.920-405.1140.

[17] App'x at 2007.

[18] *Id.*

[19] 42 C.F.R. § 412.3(d)(1).

of an adverse event."[20]  The factors leading to a physician's conclusion must be documented in the medical record.[21]

The Medicare statute also requires hospitals to implement a "utilization review plan," whereby hospitals internally review admissions for medical necessity to ensure they meet CMS criteria for reimbursement.[22]  The utilization review committee ("URC"), the entity responsible for implementing the utilization review plan, reviews the initial status determination under CMS regulations.[23]  A URC is composed of hospital staff and must include at least two physician members.[24]  Hospitals also typically employ case management staff and utilization review staff who assist the URC members in their admission reviews, advise on and monitor inpatient admissions for medical necessity, and ensure that decisions are appropriately documented.[25]  As part of their review, URC members and utilization review staff may use the same commercial screening tools utilized by Medicare contractors.

As a result of its review of the initial decision, a URC may change a patient's status from inpatient to outpatient or vice versa. According to the regulations, "[b]efore making a determination that an [inpatient] admission or continued stay is not medically necessary,

---

[20] *Id.*  Inpatient admission is also considered appropriate for Part A payment for certain surgical procedures.  *Id.* § 412.3(d)(2).  In addition, on certain occasions, "based on the clinical judgment of the admitting physician and medical record," an inpatient admission may be appropriate for payment under Part A even if the admitting physician expects a patient to require hospital care for a period of time that does *not* cross two midnights.  *Id.* § 412.3(d)(3).

[21] *Id.* § 412.3(d)(1).

[22] 42 U.S.C. § 1395x(e)(6)(A), (k); 42 U.S.C. § 482.30; App'x at 2988.

[23] 42 U.S.C. § 482.30.

[24] *Id.*

[25] Medicare Claims Processing Manual, Ch. 1, § 50.3.1.

the [URC] must consult the practitioner or practitioners responsible for the care of the patient . . . and afford the practitioner or practitioners the opportunity to present their views."[26]  Moreover, although review staff may assist in the decision, a determination that inpatient admission is not medically necessary may be made only by members of the URC itself.[27]

Critical to this appeal, a patient currently has no way to challenge her reclassification by the URC from an inpatient to someone receiving observation services and the subsequent loss of Part A coverage.  Medicare beneficiaries are, however, required to receive notice of having been placed on observation status.[28]  That notice is a "Medicare Outpatient Observation Notice" ("MOON"). An appeals process is available for Medicare beneficiaries who face discharge from a hospital and cessation of services covered under Part A after a hospital stay,[29] but that process is unavailable for class

---

[26] 42 U.S.C. § 482.30(d)(2).

[27] Specifically, "[t]he determination that an admission or continued stay is not medically necessary - (i) [m]ay be made be made by one member of the [URC] if the practitioner or practitioners responsible for the care of the patient . . . concur with the determination or fail to present their views when afforded the opportunity; and (ii) [m]ust be made by at least two members of the [URC] in all other cases."  42 C.F.R. § 482.30(d).

[28] 42 U.S.C. § 1395cc(a)(1)(Y).

[29] 42 C.F.R. §§ 405.1205–405.1206.  In addition, if Medicare makes an initial determination denying a Part A claim submitted by a hospital, a beneficiary may appeal through the same standard appeals process that a hospital can use.  *See supra* note 16; 42 U.S.C. § 1395ff(a)-(b); 42 C.F.R. §§ 405.920–405.1140.  In the class members' cases, a Part A claim is never submitted by the hospital to Medicare and so is never rejected by Medicare, and thus they cannot utilize this process.

members here—patients who have been reclassified as receiving observation services before the hospital bills Medicare for their care.

### III.    Procedural History

In 2011, a group of Medicare Part A beneficiaries filed this class action against the Secretary alleging, *inter alia*, that their Fifth Amendment Due Process rights are violated when they are classified as receiving observation services in the hospital rather than being classified as inpatients.  In 2013 the district court dismissed the suit, finding in part that plaintiffs failed to allege a property interest protected by the Due Process Clause.[30]  In 2015 we vacated in part, concluding that plaintiffs' claim that they possessed a protected property interest "in being treated as 'inpatients'" was sufficiently pleaded to survive a motion to dismiss.[31]  We remanded to the district court to consider whether they possessed such an interest.  Over the next four years, the district court denied two more motions to dismiss and each party's summary judgment motion.  The district court also certified a nationwide plaintiff class under Federal Rule of Civil Procedure 23(b)(2).[32]

In August 2019, the district court held a seven-day bench trial. After post-trial briefing, the court issued its decision on March 24,

---

[30] *Bagnall v. Sebelius*, No. 3:11CV1703 (MPS), 2013 WL 5346659 (D. Conn. Sept. 23, 2013), *aff'd in part, vacated in part, remanded sub nom. Barrows v. Burwell*, 777 F.3d 106 (2d Cir. 2015).

[31] *Barrows v. Burwell*, 777 F.3d 106, 108 (2d Cir. 2015).  The panel (Circuit Judges Ralph K. Winter, John M. Walker, Jr., and José A. Cabranes) retained jurisdiction over any future appeals in the case.  Judge Winter died on December 8, 2020.  Circuit Judge Guido Calabresi has replaced Judge Winter on the panel for this appeal.  *See* 2d Cir. IOP E(b).

[32] *Alexander v. Azar*, 370 F. Supp. 3d 302, 329–30 (D. Conn. 2019).

2020.[33]  It held that the Secretary violates the Due Process Clause by failing to provide an appeals process for Medicare beneficiaries whose inpatient admission is changed to observation status by a hospital's URC.  The district court concluded that:  (1) a URC determination to reclassify a patient who is initially admitted as an inpatient to an outpatient receiving observation services is a state action; (2) class members have a property interest in "Part A hospital coverage," and when patients are reclassified after URC review they are deprived of that interest; and (3) this deprivation occurs without the process that is required under the Fifth Amendment.[34]  As a result, the district court issued an injunction ordering the Secretary to create a process for members of the class to appeal their reclassification decision.[35]

This appeal by the Secretary followed.

## DISCUSSION

On appeal, the Secretary argues that (1) plaintiffs lack constitutional standing, (2) the case did not properly proceed as a class action, (3) the district court abused its discretion by redefining the due process analysis after trial, and (4) the Due Process Clause does not require government-administered appeals of a hospital's reclassification decision.  We find no merit in these arguments and thus affirm the district court's judgment.

## I.      Constitutional Standing

---

[33] *Alexander v. Azar*, No. 3:11-CV-1703 (MPS), 2020 WL 1430089 (D. Conn. Mar. 24, 2020).

[34] *Id.* at *38, *48–51.

[35] *Id.* at *52–53.  The complete text of the injunction is provided in the Appendix.

This court reviews the question of standing *de novo*.[36]   A plaintiff establishes Article III standing by demonstrating (1) an "injury in fact" that is (2) fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision.[37]   Where, as here, multiple plaintiffs seek the same relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."[38]   At trial, a plaintiff bears the burden of proof to demonstrate the elements of standing.[39]

## A. Standing of a Named Plaintiff

The Secretary contends that no named plaintiff established standing, and therefore that the case must be dismissed.  In particular, he alleges that no named plaintiff demonstrated that he or she suffered any financial injury as a result of being reclassified as receiving observation services.

Plaintiffs, however, identify the named plaintiff Martha Leyanna as satisfying the standing requirement.  Ms. Leyanna was initially admitted to the hospital as an inpatient, but after URC review, her status was changed to observation.  Ms. Leyanna subsequently received care at an SNF, but because she lacked a preceding three-day inpatient hospital stay, the SNF care was not covered under Medicare Part A, and she personally had to pay over $10,000.  The Secretary contends that Ms. Leyanna did not prove at trial that her SNF care was "reasonable and necessary," as is required for all services covered under Medicare.[40]   Accordingly, he argues

---

[36] *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004).

[37] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

[38] *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation omitted).

[39] *Lujan*, 504 U.S. at 561.

[40] 42 CFR § 409.30; 42 U.S.C § 1395x(i).

that even if Ms. Leyanna should have been classified as an inpatient, she did not demonstrate that the injury she suffered by not having her SNF care covered under Part A can be attributed to the classification error as opposed to the possibility that the SNF care was not "reasonable and necessary."

The evidence in the record refutes the Secretary's argument and demonstrates that Ms. Leyanna would have received Part A coverage for the SNF care if she had been classified as an inpatient. At trial, plaintiffs introduced a written document by CMS informing Ms. Leyanna that coverage under Part A for her SNF care would be denied *because* she was not classified as an inpatient during her hospital stay.[41] The letter further stated that the claim denial "can be changed" by "get[ting] the Medical Director involved and the attending doctors that admitted her to change the admittance type to inpatient services" and then "rebill[ing] it to" CMS.[42] Thus, according to CMS—the entity responsible for coverage decisions—the problem with Ms. Leyanna's Part A claim was that she was not admitted to the hospital as an inpatient, not that the SNF services she received were not "reasonable and necessary." Ms. Leyanna sufficiently demonstrated that the injury she suffered by not receiving Part A coverage for her SNF care can be traced back to the Secretary, and she therefore satisfies the Article III standing requirement as a named plaintiff.

Relatedly, the Secretary also argues that the plaintiff class includes members who have not and will not suffer any injury. "We do not require that each member of a class submit evidence of personal standing," but "no class may be certified that contains members lacking Article III standing."[43] In particular, the Secretary

---

[41] App'x at 2730–34.

[42] App'x at 2731.

[43] *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006).

argues that for class members with Part B coverage, a reclassification decision will actually save them money, because they will not have to pay the inpatient deductible under Part A.[44] But whether or not an individual class member suffers a bottom-line financial injury in a given instance, all members of the class are deprived of their property interest in coverage under Part A. Class members' Part A benefits represent a concrete property interest[45]—funds with which they assert a right to have their medical bills paid. We do not believe that a beneficiary is uninjured when she is forced to use a different payment for services that properly should have been covered under Medicare Part A, regardless of her "out of pocket" expenses.[46]

## B. Class Standing

The Secretary also alleges that the named plaintiffs do not have standing to pursue the injunction ordered by the district court. The appeal procedures created by the injunction include both an after-the-fact review process for patients who have been discharged, and an "expedited process" for current hospital patients to appeal a reclassification decision if they stayed (or will have stayed) at the hospital for three or more consecutive days.[47] The named plaintiffs have all left the hospital, and so they have claims premised on after-the-fact review. The Secretary argues that because none of them would benefit from an expedited review process, the named plaintiffs do not have "class standing" to pursue such a procedure.

---

[44] *See* App'x at 1523–35, 2607–08.

[45] *See* Part IV.B of this discussion, *infra*.

[46] *C.f. NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82–83 (D.C. Cir. 2012) (noting that a plaintiff suffered an injury when he was forced to resort to a different form of payment when he was improperly denied Medicaid coverage).

[47] *Alexander*, 2020 WL 1430089, at *52.

A plaintiff "must maintain a personal interest in the dispute . . . for each form of relief sought."[48]  Currently, no named plaintiff has an ongoing need for an expedited review of reclassification decisions during a hospital stay as other class members do.[49]  But a named plaintiff may have class standing to assert claims on behalf of other class members if "he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."[50]  That test is met here.  The named plaintiffs were harmed by being reclassified without an appeals process; indeed, many reasonably may have been harmed as well by not having an expedited review process.  In addition, the reclassification decision and absence of an appeals process also causes an injury to class members who *will* be reclassified.

The Secretary analogizes this case to *Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*,[51] in which we found the named plaintiffs did not have class standing to bring claims based on the injuries of absent class members.  But in that case, the named plaintiffs did not have standing to challenge the defendant's actions related to certificates issued by trusts in which those plaintiffs had never invested and which

---

[48] *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021); *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) (internal quotation marks omitted).

[49] It is very difficult to conceive of a named plaintiff who could have such an ongoing interest—it is unlikely for a class action litigation such as this to be decided in the time that a plaintiff would remain hospitalized.

[50] *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks, citation, and alteration omitted).

[51] 775 F.3d 154 (2d Cir. 2014).

therefore did not "implicate[] the same set of concerns" as the defendant's actions for trusts in which they did invest.[52] Here, on the other hand, the failure of the Secretary to provide an appeals process for the reclassification decision implicates the same set of concerns— namely, a loss of Part A coverage—for both the named plaintiffs and the absent class members. Accordingly, the "litigation incentives are sufficiently aligned" so that the named plaintiffs can properly assert claims on behalf of those class members who will be hospitalized in the future.[53]

## II.    Class Certification

The Secretary argues next that the district court improperly certified the plaintiff class.[54] We review a district court's certification

---

[52] *Id.* at 159, 161.

[53] *Id.* at 161. The Secretary also briefly contends that the injunction may result in Part A benefits being improperly provided to a reclassified patient for outpatient-only services covered only under Part B. The Secretary misstates the relief granted. The injunction orders that if the class member prevails in showing that the reclassification decision was erroneous, the Secretary shall disregard the reclassification "for the purposes of *determining* Part A benefits." *Alexander*, 2020 WL 1430089, at *52 (emphasis added). Thus, the injunction does not order the Secretary to provide Part A benefits for *all* services provided to a patient who was improperly reclassified as an outpatient receiving observation services. Instead, it orders that, if there were services provided that would have qualified for Part A coverage had the patient been classified as an inpatient, then those should be covered by Part A.

[54] The final class certified by the district court includes: "All Medicare beneficiaries who, on or after January 1, 2009: (1) have been or will have been formally admitted as a hospital inpatient, (2) have been or will have been subsequently reclassified as an outpatient receiving 'observation services'; (3) have received or will have received an initial determination or Medicare Outpatient Observation Notice (MOON) indicating that the observation services are not covered under Medicare Part A; and (4) either (a) were not enrolled in Part B coverage at the time of their hospitalization;

decision for abuse of discretion.[55]  A court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law.[56]  "We accord greater deference to district court decisions granting class certification than to decisions declining to certify a class."[57]

To proceed properly as a class action under Rule 23(a), a plaintiff must show that (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy).[58]  Here, as a class certified under Rule 23(b)(2), plaintiffs must also show that the Secretary "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[59]  The Secretary challenges the findings that the class satisfies the commonality and typicality requirements.

### A. Commonality

---

or (b) stayed at the hospital for three or more consecutive days but were designated as inpatients for fewer than three days, unless more than 30 days has passed after the hospital stay without the beneficiary's having been admitted to a skilled nursing facility.  Medicare beneficiaries who meet the requirements of the foregoing sentence but who pursued an administrative appeal and received a final decision of the Secretary before September 4, 2011, are excluded from this definition."  *Alexander*, 2020 WL 1430089, at *2.

[55] *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

[56] *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001).

[57] *Nextel Commc'ns. Inc.*, 780 F.3d at 137.

[58] Fed. R. Civ. P. 23(a).

[59] *Id.* 23(b)(2).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."[60] The district court did not abuse its discretion in finding the commonality requirement met. Here, all class members claim to have suffered the same injury—they were denied Medicare Part A coverage that they were entitled to because they were unable to challenge their reclassifications from inpatients to outpatients receiving observation services. As the Secretary notes, some class members were harmed because their hospital costs were not reimbursed, while others were harmed because their post-hospitalization SNF care was not covered. But "[t]he claims for relief need not be identical for them to be common."[61] That the injury arising from the absence of an appeals process may manifest itself differently depending on a beneficiary's medical situation does not defeat the commonality of the class's injury.

The Secretary also contends that there are no questions of law or fact common to the class. But "[w]hat matters to class certification is not the raising of common questions . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."[62] To demonstrate such a capacity, "Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members."[63] The common questions raised in the lawsuit have the capacity to generate class-wide answers: (1) Does a URC decision to reclassify a patient constitute state action because CMS's national guidelines and regulations significantly encourage or coerce URC behavior? (2) Are there concrete and objective factors that dictate Part A coverage such

---

[60] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (internal quotation marks omitted).

[61] *Nextel Commc'ns. Inc.*, 780 F.3d at 137.

[62] *Wal-Mart*, 564 U.S. at 350 (alteration, citation, and internal quotation marks omitted).

[63] *Nextel Commc'ns. Inc.*, 780 F.3d at 137.

that beneficiaries have a protected property interest in Part A? (3) Are beneficiaries entitled to an appeals process in the reclassification decision?[64] Each of these questions focuses on the centralized actions of CMS and the Secretary. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."[65] We therefore conclude that the district court did not abuse its discretion in finding that the commonality requirement was met.

## B. Typicality

Contrary to the Secretary's position, the district court also properly found that the class representatives met the typicality requirement. "Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."[66] The Secretary argues that because the named plaintiffs were *previously* hospitalized, they are not typical of the class members who are g*oing to be hospitalized* and who therefore have a stronger interest in the expedited appeals process for currently-hospitalized

---

[64] *See Brown v. Kelly*, 609 F.3d 467, 483–84 (2d Cir. 2010) (finding a class properly certified under the heightened standard of Rule 23(b)(3) when common questions included whether New York City had a policy of enforcing an unconstitutional statute even though other issues would require individualized inquiries); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 131 (2d Cir. 2013) (affirming class certification when "[d]espite the size and geographic scope of [the] class," the "uniform nature" of the defendant's actions put each class member in the "same position" and "ensure[d] the cohesiveness of the class").

[65] *Nextel Commc'ns. Inc.*, 780 F.3d at 137–38 (internal quotation marks omitted).

[66] *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (internal quotations omitted).

individuals. Although the named plaintiffs can only now seek retroactive review of their reclassification decision, their claims are still typical of those of future hospital patients because they arise from the same conduct. The Secretary's failure to provide an appeals process leads to the claims of both groups.[67] In addition, the legal arguments in support of the finding that the lack of an appeals process violates the Due Process Clause, including that hospital decisions constitute state action and that patients have a protected property interest in Part A coverage, are the same whether a plaintiff seeks an expedited or retroactive review process. We thus reject the Secretary's argument that the named plaintiffs' claims were atypical of those of the other class members.

### C. Certification Under Rule 23(b)(2)

The Secretary further contends that the plaintiff class was improperly certified under Rule 23(b)(2). For a class to be appropriately certified under that rule, a defendant must have acted on grounds that apply generally to the class "so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[68] Thus, a class cannot be certified "when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."[69] The Secretary argues that the "wide variation" among plaintiffs precludes the applicability of Rule 23(b)(2).[70] In particular, he again emphasizes the fact that

---

[67] *See Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (per curiam) (concluding that, although plaintiffs challenged different aspects of the child welfare system, because they alleged their injuries derived from a "unitary course of conduct by a single system," they met the typicality requirement).

[68] Fed. R. Civ. P. 23(b)(2).

[69] *Wal-Mart*, 564 U.S. at 360.

[70] Appellant Br. at 39.

some plaintiffs have already been hospitalized, and thus would benefit from the after-the-fact appeal procedure created by the injunction, while others have yet to be hospitalized and so would benefit from the expedited review process.

We are not persuaded.  Rule 23(b)(2) does not require that "the relief to each member of the class be identical, only that it be beneficial."[71]  "That means that different class members can benefit differently from an injunction."[72]  Here, all class members benefit from the injunction ordered by the district court:  each now has the ability to appeal the denial of Part A coverage when they are reclassified from an inpatient to an outpatient receiving observation care.  That the injunction includes both a mechanism for retroactive review and prospective review does not make the class unsuitable for relief under Rule 23(b)(2).[73]  Because this lawsuit is predicated on "acts and omissions" of the Secretary that apply generally to the class, the class was properly certified under Rule 23(b)(2).[74]

---

[71] *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015).

[72] *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020).

[73] *See, e.g.*, *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014) (affirming a district court's certification of a class under Rule 23(b)(2) where some members would receive new retirement benefits and others would benefit from new notice of provisions of the retirement plan).

[74] *See Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir. 1994) (A plaintiff class that "seek[s] injunctive relief and . . . predicate[s] the lawsuit on the defendants' acts and omissions" satisfies Rule 23(b)(2).).  The Secretary also contends that the district court abused its discretion in limiting the class after trial to include only patients who were or will be reclassified from inpatients to outpatients receiving observation services (as opposed to also including patients initially classified as receiving observation services).  But courts have an affirmative duty to monitor class decisions as the case develops.  *See Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016); Fed. R. Civ. P. 23(c)(1)(C) (a certification order may be altered or amended before final judgment).  The district court determined from the evidence

## III.    Shift in the Due Process Theory

The Secretary next contends that the district court "abused its discretion by materially changing the focus of the case after the close of evidence."[75]  He objects to (1) the district court's identification of Medicare Part A benefits as plaintiffs' protected property interest under the Due Process Clause and (2) the district court's identification of the URC decision to reclassify a patient as the pertinent act for the state action analysis.  While the issue of adequate notice to the party of a shift of focus by the district court presents a close question, we conclude that the district court did not abuse its discretion in either instance.

First, the Secretary argues the district court improperly characterized plaintiffs' property interest as the entitlement to Medicare Part A benefits, as opposed to the entitlement of being classified as hospital inpatients (what he characterizes as the property interest plaintiffs advocated for before and during trial).  However, as the district court explained, "the gravamen of the Plaintiffs' complaint is precisely the deprivation of Part A coverage, and not simply the denial of inpatient admission in itself."[76]  The first paragraph of the original complaint reinforces the point:  "The plaintiffs are Medicare beneficiaries who received in-patient hospital services, but *were deprived of Medicare Part A coverage* by being improperly classified as outpatients."[77]  In addition, at trial plaintiffs continued to make clear

---

introduced at trial that only patients who were reclassified from inpatients to outpatients were deprived of a property interest protected by the Due Process Clause.  It then properly modified the class to include only those beneficiaries.  We see no error in that decision.

[75] Appellant Br. at 41.

[76] *Alexander*, 2020 WL 1430089, at *39; *see also Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1998) ("The issues are defined by the pleadings of the parties before the court . . . .").

[77] App'x at 93 (emphasis added).

that they intended to prove that they had a property interest in Part A coverage.[78]  Accordingly, the district court did not err or abuse its discretion in framing the question of whether plaintiffs suffered a due process violation by determining whether plaintiffs had a protected property interest in Part A coverage.

We also reject the Secretary's claim that the district court abused its discretion in evaluating the URC decision to reclassify a patient, and not the initial decision to classify a patient as receiving observation services, as the decision that could be considered a state action for purposes of the due process analysis.  The Secretary argues that he was prejudiced by the district court's choice because he did not, but could have, "presented evidence focused on the decision to reclassify patients."[79]

While we can appreciate the Secretary's argument here, the Secretary was aware from the very beginning of this eleven-year litigation that members of the plaintiff class were first admitted as inpatients and then subsequently reclassified as outpatients receiving observation services.[80]  In fact, some of the named plaintiffs fell into

---

[78] App'x at 762 (plaintiffs' opening statement that "the evidence will show . . . that class members have a protected property interest by being entitled to Part A benefits").  Indeed, we note that being classified as an inpatient has no apparent value for plaintiffs in and of itself—rather, the import of the inpatient classification *is* its effect on Part A coverage.

[79] Appellant Br. at 44.

[80] App'x at 93 (original complaint:  "In some instances, beneficiaries who have been formally admitted have their status retroactively changed to observation"); *id.* at 102–03 (original complaint:  "A patient who has been formally admitted may be reclassified, while still in the hospital, as an outpatient on observation status by the hospital's utilization review committee (URC)").

this very category.[81]   In addition, a plaintiff testified at trial that he was reclassified from an inpatient to one receiving observation services.[82]   Thus, contrary to his allegations, the Secretary was on notice that a focus of the litigation was on the reclassification decision and its effect on plaintiffs.   The district court did not, therefore, effectively "amend" plaintiffs' complaint by analyzing the URC reclassification process, as the Secretary argues.

Moreover, as described more fully in our discussion on the merits of the due process claim, both the Secretary and plaintiffs *did* introduce evidence on this topic; so much so that there was sufficient evidence for the district court to conclude that the URC reclassification decision constituted state action.   Accordingly, the Secretary has not shown that he was prejudiced by the district court's analysis.[83]   He was aware that the role of the URCs in reclassifying patients was a focus of the plaintiffs' claims, and he was free to offer any evidence and argument on the subject that he had acquired over this lengthy litigation.

To be sure, the seven-day trial encompassed testimony on more than just the reclassification question.   The Secretary notes that plaintiffs argued in post-trial briefing that other classification decisions made in hospitals constitute state action.[84]   But the district court was not constrained in its decision by either party's legal arguments.   Rather, the district court was entitled to decide, based on

---

[81] App'x at 96 (original complaint:  "Plaintiff LEE BARROWS . . . was formally admitted before July 8, [but] on July 8 his status was changed to observation status, retroactive to when he had been formally admitted").

[82] App'x at 814–17.

[83] *See United States v. Certain Real Prop. & Premises*, 945 F.2d 1252, 1257 (2d Cir. 1991) (noting that a party is not prejudiced when he has a fair opportunity to defend himself from the claim).

[84] App'x at 627–29.

the evidence presented at trial, whether one decision—the URC decision—constituted state action.  To do so was not an abuse of discretion.

## IV.   Merits of the Due Process Claim

We now turn to the merits of the plaintiffs' claim that the current Medicare structure violates their due process rights.[85]  The district court concluded it does.  "On appeal from a judgment after a bench trial, we review the district court's finding of fact for clear error and its conclusions of law *de novo*."[86]  Mixed questions of law and fact are reviewed *de novo*.[87]  Under clear error review we can properly reject a district court's factual findings only if we are "left with the definite and firm conviction that a mistake has been committed."[88]

In order for plaintiffs to establish a due process violation they must show that (1) state action (2) deprived them of a protected interest in liberty or property (3) without due process of law.[89]

### A. State Action

To succeed on a Due Process Clause claim, plaintiffs must first demonstrate that the challenged activity leading to their constitutional deprivation is "fairly attributable" to the state.[90]  "Actions of a private entity are attributable to the State if there is a sufficiently close nexus between the State and the challenged action

---

[85] "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

[86] *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.2 (2d Cir. 2013) (per curiam) (quotation omitted).

[87] *Id.* at 187 n.3.

[88] *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

[89] *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

[90] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

of the entity so that the action of the latter may be fairly treated as that of the State itself."[91]  There are "a host of facts that can bear on the fairness of" such an attribution.[92]  Accordingly, this court has identified three "main tests" to determine whether a private entity's action is fairly attribute to the state:  "(1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); [and] (3) when the entity has been delegated a public function by the state ('the public function test')."[93]

The district court concluded that once a physician has signed an inpatient admission order, a subsequent decision by a URC that the patient's status should be changed to that of an outpatient receiving observation services constitutes action fairly attributable to the state.[94]  It found that CMS "put[s] significant pressure on hospitals to submit only payable inpatient admission claims for Part A payment" by "audit[ing] hospital inpatient admissions for compliance with CMS's inpatient criteria," "ensuring that statutorily mandated URCs review inpatient admissions for compliance with CMS criteria and change the status of patients believed to be ineligible for Part A payment," and educating hospitals on proper inpatient admission practices.[95]  Thus, it found that under either of the first or second tests articulated by this court, "compulsion" or "significant

---

[91] *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (internal quotation marks and alteration omitted).

[92] *Id.* (internal quotation marks omitted).

[93] *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration and internal citation omitted).

[94] *Alexander*, 2020 WL 1430089, at *45–48.

[95] *Id.* at *45, *48.

encouragement," the private hospitals' actions are fairly attributable to the state.[96]  We agree.

### i.      Factual Findings

To reach this conclusion, we first must address the Secretary's factual challenges.  The Secretary contends that the district court's use of specific items of evidence to support its findings about URCs was clearly erroneous.   He contends that the district court improperly conflated evidence about other hospital staff, such as case review managers or utilization review staff, with the URCs themselves.  The district court, however, supported its conclusions by analyzing the CMS regulations and guidance that specifically pertain to URCs.  In addition, it cited the Medicare Claims Processing Manual as evidence that CMS "encourages and expects hospitals to employ case management staff to . . . assist the [URC] in the decision-making process."[97]   Accordingly, and based on other trial testimony, the district court concluded that "in practice, utilization review is often conducted not by the URC as a formal body, but by the utilization review team, which includes individual members of the URC as well as other utilization review personnel."[98]  For example, one physician testified that a "team of staff" reviews her orders to make sure they are compliant with Medicare,[99] and another hospital's Utilization Management Plan stated that its Utilization Management Committee "[d]elegate[d] responsibility for implementation of the Plan to [its] Utilization Management department," which included an operations manager and a nurse.[100]  Based on our review of the record, we do not

---

[96] *Id.* at *44.

[97] *Id.* at *19, *47 n.74 (quoting Medicare Claims Processing Manual, Ch. 1, § 50.3.1).

[98] *Id.* at *47 n.74.

[99] App'x at 1038.

[100] App'x at 3064, 3069.

find we are "left with the definite and firm conviction that a mistake has been committed" in the district court's interpretation of the decision-making process,[101] and thus its evaluation of evidence concerning hospital review staff in the state action analysis was not clearly erroneous.

The Secretary also challenges the district court's factual conclusion that URCs, as opposed to a patient's attending physician, have a "decisive influence" on the reclassification decision.[102] We do not find that conclusion to be clearly erroneous.

We note that there is some inconsistency on this point in the record. According to the regulations, a patient status change requires concurrence by the treating physician.[103] A case management nurse also testified that only the treating physician could change a patient's status at her hospital.[104]

But other evidence in the record points to the critical influence of the URC in the reclassification decision. One treating physician testified that she did not have the final decision as to whether the Two Midnight determination was met and thus to classify a patient as an inpatient.[105] She stated that "doctors generally defer to that team of experts who are charged—it's their job to review these orders. They have expertise in this order review. And we defer to them as far as the guidance on writing a compliant order with CMS regulations."[106] Another treating physician testified that she "had initially changed [a patient's] status to observation based on the pressure that [she] was

---

[101] *U.S. Gypsum Co.*, 333 U.S. at 395.

[102] *Alexander*, 2020 WL 1430089, at *22.

[103] Medicare Claims Processing Manual, Ch. 1, § 50.3.2.

[104] App'x at 1385–86.

[105] App'x at 1130–31.

[106] App'x at 1131.

getting from the hospital," and that "we're pretty much coached that you follow what [the reviewers] tell you."[107]  Still another treating physician stated that there were instances involving a patient whom he had admitted as an inpatient but whose status was then changed to observation services without informing the treating physician.[108] In addition, a utilization management program specialist testified that if there is a lack of agreement between the treating physician and the utilization management review the hospital is *not* allowed to bill for inpatient reimbursement.[109]

"[C]lear error review mandates that we defer to the District Court's factual findings,"[110] and "we may not reverse a finding even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently."[111]  There is more than sufficient evidence supporting the district court's finding that URCs have a decisive influence in the reclassification decision.  And thus, the district court's finding was not clearly erroneous.

### ii.    Legal Conclusions

We now address the Secretary's challenge that the reclassification decision does not constitute state action.  First, like the district court, we conclude that the result in this case is not dictated by *Blum v. Yaretsky*.[112]  There, the Supreme Court held that discharges or transfers of Medicare beneficiaries from nursing homes to lower-care facilities initiated by attending physicians or nursing home

---

[107] App'x at 865, 863.

[108] App'x at 1750.

[109] App'x at 1172.

[110] *Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 277 (2d Cir. 2021) (internal quotation marks omitted).

[111] *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019) (internal quotation marks and alterations omitted).

[112] 457 U.S. 991 (1982).

administrators did not constitute state action.[113]  As in this case, each nursing home was required to establish a URC that periodically assessed whether each patient's continued stay in the nursing home was justified.[114]  Critically, however, the transfer decisions at issue in *Blum* were made by the attending physicians or nursing home administrators, and *not* by the URC, as is the case here.[115]  The Supreme Court thus found that the transfer decision was based only on medical decisions by healthcare professionals without interference by the government.[116]

Because the claimed due process violation here occurs where there is a *URC-initiated* decision, *Blum* is not controlling.  Upon review, we conclude that the URC decision to reclassify an inpatient to an outpatient receiving observation services is fairly attributable to the state.

To start, the Medicare statute expressly requires hospitals to form and utilize URCs in admission decisions.[117]  Furthermore, the decision-making process that URCs engage in is governed largely by statute and regulation, a factor that weighs in favor of finding state action.[118]  Moreover, CMS pressures URCs to adhere closely to those

---

[113] *Id.* at 1003, 1012.

[114] *Id.* at 994–95.

[115] *Id.* at 1007 n.17; *see also Kramer v. Heckler*, 737 F.2d 214, 219 (2d Cir. 1984) (concluding that *Blum* was not controlling on the question of whether a URC decision constituted state action).

[116] *Blum*, 457 U.S. at 1008 n.18 (noting that although the nursing homes had to complete patient care assessment forms designed by the state, the regulations did not require the nursing homes to rely on those forms in making discharge or transfer decisions).

[117] 42 U.S.C. § 482.30.

[118] *See Kramer*, 737 F.2d at 220–21 (declining to determine the state-action question, but explaining that there appeared to be a strong basis for finding state action in the decisions of URCs that evaluate entitlement to Medicare

regulations so that hospitals only submit claims for reimbursement that the regulations direct are appropriate for payment by Medicare (for inpatient admissions and thus Part A payment, those patients who satisfy the Two Midnight Rule). CMS applies that pressure in part by engaging in audits and post-payment reviews of a hospital's inpatient claims.[119] The process for appealing a post-payment audit is costly for a hospital.[120] In addition, one witness testified at trial that Medicare contractors audited his hospital's claims for inpatient admission at a significantly higher frequency than it did for outpatient claims,[121] which supports the finding that CMS strongly regulates inpatient admission decisions. Because a hospital faces a risk that it will not be reimbursed for services it already provided to a patient if it improperly classifies that patient as an inpatient, URCs are strongly incentivized to make decisions that conform to CMS guidance. That CMS pressures hospitals in their decision making is further supported by CMS's own acknowledgment of observers' "concerns," submitted during rulemaking, that "hospitals appear[ed] to be responding to the financial risk of admitting Medicare beneficiaries for inpatient stays that might later be denied upon contractor review by electing to treat beneficiaries as outpatients receiving observation services, rather than admitting them as inpatients."[122]

Evidence at trial showed that CMS encouraged hospitals to respond to this pressure by implementing the Two Midnight Rule in a uniform fashion. The strong link between CMS and the URCs was evidenced by the extensive education and training materials

---

benefits, in part because the decision-making process was governed "largely by statute, regulation, HCFA manual, and transmittal letters").

[119] *See, e.g.,* App'x at 911–12, 1694.

[120] App'x at 925.

[121] App'x at 915–16.

[122] Suppl. App'x at 211 (78 Fed. Reg. 509455, 50922 (Aug. 19, 2013)).

provided by CMS on the standards it uses to determine the appropriateness of inpatient claims to help ensure URC conformity with CMS policy.[123]    Hospital URCs may even use the same commercial screening tools to review inpatient claims as Medicare contractors.[124]

The Secretary responds that a URC's decision as to whether someone should remain an inpatient is a result of independent medical judgment and cannot be traced back to CMS.    But the evidence shows CMS exerts pressure on URCs to submit claims only for inpatient admissions that *CMS* would characterize as inpatient admissions, and to apply the Two Midnight Rule to patients in a substantially similar manner that *it* does.[125]    Therefore, when a URC determines that a patient does not meet the inpatient criteria and so

---

[123] App'x at 3451 (a Medicare contractor stating on an educational call with hospital providers that its "goal [was] to assist providers in reaching [a] 90% or greater compliance standard of the Two-Midnight Rule"); *id.* at 3546 (after a Medicare contractor presented on the Two Midnight Rule on an educational call with hospital providers a provider noting "it seem[ed] that they should change how they approach their team and how to educate their physicians" on the Rule).

[124] App'x at 1375.

[125] *C.f. Catanzano v. Dowling*, 60 F.3d 113, 119 (2d Cir. 1995) (holding that decisions by certified home health agencies constitute state action when they are not purely medical judgments but are instead compelled by a government regulation).    The present scenario is thus dissimilar to *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) (en banc), relied upon by the Secretary. There, the court held that a private college's decision to discipline a student did not constitute state action simply because the college had adopted disciplinary rules in response to a state law directing colleges to promulgate "regulations for the maintenance of public order."  *Albert*, 851 F.2d at 563. There was no evidence in that case that any state official had "ever sought to affect disciplinary measures taken by private college administrators, or ha[d] ever even inquired into such a matter."  *Id.* at 570.    The degree of interference by the state here bears little resemblance to *Albert*.

reclassifies the patient, it "may be fairly treated as [a reclassification] of the State itself."[126]

## B. Property Interest

The Secretary next challenges the district court's conclusion that plaintiffs have a protected property interest in Medicare Part A coverage. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."[127] A benefits regime, such as Medicare, creates a "legitimate claim of entitlement" when the statutes and regulations governing the distribution of benefits "meaningfully channel official discretion by mandating a defined administrative outcome."[128] In addition, even though an official may have to "use judgment in applying" a standard, that does not preclude the existence of a protected interest.[129]

The district court held that the "decision to provide Part A payment, and thus coverage, is governed by mandatory criteria that meaningfully channel official discretion" and so beneficiaries have a "protected property interest in Part A coverage."[130] In particular, it found that "when the regulatory regime is viewed as a whole, including CMS's sub-regulatory guidance, its enforcement practice, and other statutory provisions, it is clear that the Two Midnight Rule

---

[126] *Brentwood Acad.*, 531 U.S. at 295 (internal quotation marks omitted).

[127] *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

[128] *Barrows*, 777 F.3d at 113 (internal quotation marks and alterations omitted).

[129] *Bd. of Pardons v. Allen*, 482 U.S. 369, 375–76 (1987) (internal quotation marks omitted).

[130] *Alexander*, 2020 WL 1430089, at *35.

does require CMS to cover inpatient admissions that satisfy the Rule."[131]

Upon review of the evidence, we agree with the district court that the Two Midnight Rule (and the 24-hour rule in the period before the Two Midnight Rule was promulgated) adequately channels official discretion such that if a patient meets this benchmark, Medicare will provide coverage under Part A for services provided to him. The record demonstrates that CMS's guidelines require its contractors to approve claims that satisfy the Rule.[132] In addition, CMS expresses to hospital providers that if the Rule is satisfied, a claim for Part A benefits will be granted.[133] Like the district court, we find no evidence that CMS denies coverage under Part A for claims satisfying the Two Midnight Rule as a result of its own discretion. Accordingly, the Two Midnight Rule and its surrounding guidance "mandate[] a defined administrative outcome" in terms of Part A coverage such that a Medicare beneficiary has a legitimate claim of entitlement to that coverage.[134]

---

[131] *Id.* The district court concluded the same with respect to the 24-hour rule used in the period before the Two Midnight Rule was promulgated. *Id.* at *42.

[132] *See, e.g.*, App'x at 3043 (a flowchart promulgated by CMS showing that if "it was reasonable for the admitting physician to expect the patient to require medically necessary hospital services for 2 Midnights or longer" then the "[c]laim *is [p]ayable* [u]nder Part A ([a]ssuming all other requirements are met)" (emphasis added)).

[133] *See* App'x at 2619 (CMS guidance that when a "physician expects the beneficiary will require medically necessary hospital services for 2 or more midnights . . . and orders admission based upon that expectation, the services are generally *appropriate* for inpatient payment under Medicare Part A. QIOs [Medicare contractors] will approve these cases so long as other requirements are met").

[134] *Barrows*, 777 F.3d at 113 (internal quotation marks omitted).

The Secretary responds that the physicians who make up the URCs must use their medical judgment in applying the Two Midnight Rule to determine whether they expect a patient to require hospital care that crosses two midnights.[135]  But their use of judgment to make that determination does not mean their discretion is not adequately channeled for purposes of discerning a property interest.  When a private official uses judgment in applying the standards set by the state, so long as an administrative action is "*required* after the [private entity] determines (in its broad discretion) that the necessary prerequisites exist," a property interest exists in the benefits regime.[136]  Here, after the URC physicians use their medical judgment in determining that the requirements of the Rule are met, the services provided to the patient are considered appropriate for coverage under Medicare Part A.

We therefore conclude that plaintiffs have a property interest in coverage under Medicare Part A that is cognizable under the Due Process Clause.

## C. The Process That is Due

After establishing state action and a property interest to which they are entitled, plaintiffs must lastly show they have been deprived of that property interest without due process of law.[137]  To determine whether a deprivation has been made without the process required, the court must engage in the familiar three-factor test first articulated in *Mathews v. Eldridge*.[138]  "This test requires that we balance:  (1) the

---

[135] Appellant Br. at 62 (citing 42 C.F.R. § 412.3(d), which states that the Two Midnight Rule determination must be based on complex medical factors).

[136] *Allen*, 482 U.S. at 376.

[137] *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59.

[138] 424 U.S. 319, 335 (1976).

private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; [and] (3) the government's interest, including the possible burdens of alternative procedures."[139]

We first conclude that there is a substantial private interest at stake in this case. This court has already recognized in the context of Medicare Part A coverage the "astronomical nature of medical costs."[140] The record presented here is also replete with evidence of the significant financial costs borne by patients who do have their care covered by Medicare Part A.[141] CMS itself has acknowledged that denial of Part A coverage can have "significant financial implications" for Medicare beneficiaries.[142] The Secretary contends that the district court improperly used $10,000, the average cost of post-hospitalization SNF care, as a measure of the private interest at stake when only a small number of Medicare patients need such care. A witness testified that only 4% of patients who spend three days in a hospital but less than three days as inpatients receive post-hospital extended care.[143] But the same witness also testified that as many as about five times more patients are recommended to receive SNF care

---

[139] *Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) (internal quotation marks omitted).

[140] *Kramer*, 737 F.2d at 222.

[141] *See* App'x 3083–87 (hospital bill of Andrew Roney, a testifying witness, showing an out-of-pocket cost of $3,501.84 for hospital services after he was reclassified from an inpatient to one receiving observation services); *see also* Amicus Curiae AARP *et al.* Br. at 18 ("The financial consequences of outpatient observation classifications can be catastrophic for Medicare beneficiaries who can face staggering, and often surprising, bills for hospital stays and subsequent SNF stays not covered by Medicare Part A.").

[142] App'x at 2763.

[143] App'x at 1530–31 (citing App'x at 2609–10).

after their hospitalization than actually receive it.[144]  It is therefore
appropriate to consider the cost of post-hospitalization SNF care as a
measure of the private interest at stake because such care is needed
by a substantial portion of the class.  The evidence presented at trial
also demonstrated the emotional and psychological costs, beyond the
financial costs, for a patient who is denied Medicare Part A
coverage.[145]  Furthermore, some patients may have to endure lower-
quality medical care or even forgo it altogether as a result of the Part
A deprivation.[146]  The private interest in this case is thus highly
significant.

We also conclude that there currently exists a serious risk that
Medicare beneficiaries are erroneously deprived of Part A coverage
to which they are entitled by URC reclassification decisions that they
are unable to challenge.  Evidence presented at trial showed that
when hospitals appeal the denial by a CMS contractor of claims
submitted for reimbursement under Medicare Part A (for services
provided to a patient the hospital classified as an inpatient), hospitals
have a high rate of success in obtaining a reversal of that denial.[147]
Accordingly, there is a high rate of error in the reviews performed by

---

[144] App'x at 1534.

[145] App'x at 857 (a patient said to her doctor, "I just want to die" rather
than "bankrupt my family" because her medical treatment was not covered
under Part A).

[146] *See, e.g.*, App'x at 786–87, 807 (plaintiff Leyanna's granddaughter
testifying that her grandmother could not afford to pay out of pocket for
SNF care after a certain period of time and so had to move to a facility less
well-equipped for treating her injuries); App'x at 1091 (a physician
testifying that without Medicare Part A coverage "a lot of those patients
will forgo necessary care, and they'll go home to an unsafe situation
because they can't or they won't burden their families with this amount of
cost").

[147] App'x at 1134 (CMS reported a 37.5% overturn rate for Part A claims
in 2016).

CMS contractors of inpatient admissions as to whether a patient properly qualifies for Part A coverage under CMS guidelines.  Like the district court, this leads us to conclude that there is a similarly high risk of error in a URC's determination of whether a patient qualifies as an inpatient and thus receives Part A coverage.  The URC review of attending physician inpatient admission decisions closely resembles the CMS contractor reviews of hospital inpatient admission decisions.  CMS contractors conducting reviews do so under the same criteria established by CMS for classifying patients as inpatients—the Two Midnight Rule—as URC personnel reviewing an inpatient determination.[148]  In addition, the same types of commercial screening tools are utilized by CMS contractors and URCs to aid their decisions.[149]  Thus, the error rate of one group of reviewers (the CMS contractors) likely mirrors the error rate of another group of reviewers (the URCs).

In addition, CMS has acknowledged that there may be an "unexpected" "large number of long outpatient stays" submitted by hospitals which "likely met the 2-midnight policy's expected-length-of-stay requirement for inpatient admissions."[150]  That also indicates that there is a large risk of erroneous deprivation of Part A services.  The appeals process currently afforded to hospitals substantially mitigates the risk that their inpatient claims are improperly denied for reimbursement.  An appeals process for the URC reclassification

---

[148] App'x at 1133–34 (trial testimony that when hospital providers appeal CMS contractor decisions they are appealing under the Two Midnight Standard).

[149] *Compare* App'x at 3065 (a hospital's reference to "[n]ationally accepted evidence based criteria" indicating that it uses commercial screening tools), *with* App'x at 2252 (CMS's manual directing that a "reviewer shall use a screening tool as part of their medical review").

[150] App'x at 3013.

decision would similarly likely improve the accuracy of properly covering patients' care under Part A.

As to the third factor, there is no doubt that the Secretary would be burdened by the creation of the appeals procedures advocated for by plaintiffs. The government would have to promulgate new regulatory and sub-regulatory guidance, draft new or modify existing contracts, develop appropriate educational and training materials, secure appropriations from Congress, and draft and approve a new notice to beneficiaries.[151] Thus, creating an appeals process would certainly impose some costs on the Secretary. But "[f]inancial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard."[152] And courts have previously required procedures to be implemented that result in a significant financial burden on an agency in order to remedy a due process violation.[153]

Moreover, the Secretary has already established an appeals and expedited appeals process for hospitals and beneficiaries to challenge other Medicare Part A payment and coverage denials.[154] It is possible that the Secretary could leverage some of that infrastructure for a process to appeal the decision to reclassify a patient from an inpatient to an outpatient receiving observation services. Thus, although the Secretary would have to expend financial resources to create an appeals process for this plaintiff class, the burden on the Secretary is

---

[151] *See Alexander*, 2020 WL 1430089, at *51.

[152] *Mathews*, 424 U.S. at 348.

[153] *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 267–70 (1970) (holding that a recipient of public benefits needs to be provided with an opportunity to confront and cross-examine the witnesses relied on by the department in the termination of their benefits).

[154] 42 C.F.R. §§ 405.1205–405.1206; 42 U.S.C. § 1395ff(a)-(b); 42 C.F.R. §§ 405.920–405.1140.

lessened somewhat by the existence of similar Medicare appeal procedures.

Ultimately, in balancing the three *Mathews* factors, we hold that plaintiffs' substantial interests, the current material risk of erroneous deprivation, and the likely benefit of additional procedures outweigh the burden on the Secretary, which is mitigated somewhat by the existence of similar appeal procedures, in instituting an appeals process to challenge the URC reclassification decision. The decision to reclassify a hospital patient from an inpatient to one receiving observation services may have significant and detrimental impacts on plaintiffs' financial, psychological, and physical well-being. That there is currently no recourse available to challenge that decision also weighs heavily in favor of a finding that plaintiffs have not been afforded the process required by the Constitution.[155]

In sum, plaintiffs have demonstrated that the Secretary violates their due process rights when URCs reclassify them from inpatients to those receiving observation services without providing a mechanism to appeal that decision.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court and its grant of injunctive relief.[156]

---

[155] *See, e.g.*, *Doolen v. Wormuth*, 5 F.4th 125, 134 (2d Cir. 2021) (concluding that there was no due process violation when defendant "provid[ed] [a] robust combination of pre- and post-deprivation procedures" for plaintiffs challenging a decision).

[156] The Secretary previously filed a motion to stay the district court's injunction pending a decision in this appeal. On July 16, 2021, the court granted a temporary stay of the injunction pending decision on the motion. We now **DENY** the Secretary's motion for a stay as moot.

## APPENDIX

Injunction Entered by the District Court in *Alexander v. Azar*, No. 3:11-CV-1703 (MPS), 2020 WL 1430089 (D. Conn. Mar. 24, 2020):

1.  The Secretary shall permit all members of the modified class to appeal the denial of their Part A coverage.

2.  For class members who have stayed, or will have stayed, at the hospital for three or more consecutive days, but who were designated as inpatients for fewer than three days, the Secretary shall permit appeals through an expedited appeal process substantially similar to the existing expedited process for challenging hospital discharges.

3.  In the appeals to be established under this order, the Secretary shall permit class members to argue that their inpatient admission satisfied the relevant criteria for Part A coverage—for example, that the medical record supported a reasonable expectation of a medically necessary two-midnight stay at the time of the physician's initial inpatient order, in the case of a post-Two Midnight Rule hospital stay—and that the URC's determination to the contrary was therefore erroneous.  If the class member prevails, the Secretary shall disregard, for the purposes of determining Part A benefits, including both Part A hospital coverage and Part A SNF coverage, the beneficiary's reclassification as an outpatient that resulted from the URC's erroneous determination.

4.  The Secretary shall provide class members with timely notice of the procedural rights described above.

5.  For those class members whose due process rights were violated, or will have been violated, prior to the availability of

the procedural protections set forth above, the Secretary shall provide a meaningful opportunity to appeal the denial of their Part A coverage, as well as effective notice of this right.

6.  The Secretary may provide greater procedural protections than the ones described above, and may provide these protections to a broader class of beneficiaries, provided that the due process rights of the class members are fully protected as set forth above.